**Freddie LYNEM, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Supreme Court of Kentucky.

April 11, 1978.

Jack Emory Farley, Public Defender, Larry H. Marshall, Asst. Public Defender, Frankfort, for appellant.

Robert F. Stephens, Atty. Gen., Victor Fox, Asst. Atty. Gen., Frankfort, for appellee.

JONES, Justice.

Freddie Lynem appeals from a judgment sentencing him to imprisonment for 20 years pursuant to a jury verdict finding him guilty of robbery in the first degree under the provisions of KRS 515.020.

As grounds for reversal it is argued: (1) that the prosecutor improperly commented on Freddie's custodial silence; (2) that the trial court's instructions were improper; (3) that the trial judge erred by allowing introduction of other criminal activity by Freddie; (4) the closing argument of the prosecutor was inflammatory and prejudicial; and (5) that the trial court erred by denying Freddie's request for a pre-trial line-up.

Counsel at the trial level was the local public defender of Fayette County. On this appeal, Freddie is represented by the public defender of the Commonwealth.

Richard Vance, Harold Greathouse, and D. H. Leach, businessmen from North Vernon, Indiana, spent a pleasant day at the races at Keeneland on October 20, 1976. Fortune smiled on them, as they were each heavy winners. They enjoyed the races, as well as the beautiful Kentucky Autumn. Each of them was exuberant as their selected horses won. After each race each of them would quench his thirst with his favorite brand of beer.

After the last race, Freddie approached them as they were celebrating their good day at the races. Freddie sold a watch to Vance for $10.00. He then sought a ride to Lexington. Bolstered by the beer and their winnings, Vance, Greathouse, and Leach were in a jovial mood. They gave Freddie a ride to Lexington. On their way they stopped at a liquor store. They bought a bottle of whiskey for their own use and a bottle of wine for Freddie.

Subsequently, they went to the University Inn and rented two rooms. They had several drinks. Freddie, who turned out to be a skillful con artist, was very helpful. He went to the desk clerk and procured a key for one of the rooms, and also brought a bucket of ice. In the meantime, Freddie offered to obtain some girls for Vance, Greathouse, and Leach. In testifying about that matter, Vance said to Freddie:

> " 'Well, go get them.' And so he wanted to use my car. So I give Gabby (Greathouse) the keys to my car and I said: 'Well, are you going with him?' I didn't want to give my keys to anybody, you know, and Gabby says: 'Yeah, I'll go with him.' And he walked out the door and came back in and he throwed Brooksy (Leach) his money—he had about eleven, twelve hundred dollars there, and he said: 'I'm not gonna take this money if I'm going with this guy.' "

When Greathouse came back to the motel room he had already handed the keys "to the colored boy" (Freddie). Greathouse went back out to go with Freddie but he had already left in Vance's Cadillac automobile. In approximately 45 minutes, Freddie returned accompanied by another colored boy. In reference to his companion, Freddie said: "This is my 'procurer,' and pulled that pistol out from—out from under wherever he had it and he stuck it in Gab-

by's face." The man who accompanied Freddie had on one of those "long coats." He opened the coat and had a shotgun. He said, "Boys, I want your money." So at the point of a pistol by Freddie and at the point of a shotgun by Freddie's colored companion, who was Gary Shanks, they robbed Vance of $800.00, Greathouse of $1,000.00, and Leach of $180.00. They then fled the scene.

Freddie left Lexington on the 11 o'clock bus for Pontiac, Michigan. Subsequently, he was arrested in Pontiac on a charge of three counts of first-degree robbery. He was extradited to Lexington, Kentucky, on May 4, 1977, and was tried on May 27, 1977.

Vance, Greathouse, and Leach reported the robbery to the police and at the Lexington Police Station they were shown the photographs of some 50 persons. From the photographs Vance and Leach picked out those of Freddie Lynem and Gary Shanks. Greathouse was unable to identify the photographs that night. Freddie was described by the victims as being slender, and having an afro haircut, and he was ". . . light-complected colored fellow." He was wearing a white hat and underneath it was a turban. All of the witnesses for the Commonwealth described him as having a gold tooth. Some of the witnesses testified that he was wearing an earring.

Vance, Greathouse, and Leach testified that the amount they had to drink didn't affect their judgment. That was corroborated by the police, as well as by the desk clerk at the University Inn. Vance's explanation about taking up with a stranger was as follows:

"Oh, I don't know. Shoot, we're just country boys out having a good time, and, you know, you just don't think about somebody—I've been around colored folks all my life, had 'em work for me, I trust most of 'em; and young kid like that? Heck, I got children about his age; I didn't think nothing about asking that boy to—If he asked us to ride to town, give us a hard-luck story. I didn't think nothin' about ridin' him to town, never thought once about it. In fact, when he

come in there and pulled that gun, I couldn't believe it, you know, it—you know, you're not that suspecting a personality; or, I'm not."

At the close of the testimony for the Commonwealth, Freddie took the witness stand in his own defense. He agreed with most of the testimony of Vance, Greathouse, and Leach, but denied that he committed armed robbery. Freddie testified he committed theft by unlawful taking. He further testified that one of the men asked him if he knew where they could get some "good women." Freddie told him he was talking to the right person. Freddie told an incredible story that the men gave him $700.00 so that he could impress the women with the kind of money they would be able to get and that Greathouse delivered the car keys to him. He rode around in the car for a while as if the car belonged to him. He testified that he drove over to the home of his girl friend, Sarah Dunson, and showed her the seven $100 bills.

Sarah Dunson testified that Freddie came by her house between 5 and 6:30 P.M. on October 20, 1976, and that he was driving a blue Cadillac. She testified that Freddie gave her $2.00 and that the only other money she saw in Freddie's possession was two $1.00 bills.

The court now directs its attention to the issues presented on appeal.

██ Freddie first contends the prosecutor erred by commenting on his custodial silence. During the redirect examination of Detective Giles, the Commonwealth's Attorney asked this question:

"This man (Freddie) has made no statement to you either, has he, Detective Giles?

A. No, he has not."

Because Freddie had not made any statement his trial counsel must not have thought it hurt, because he didn't voice any objection. In the absence of an objection or some other prompt request for relief, there was no error on the part of the trial court simply because he had no opportunity to rule upon the matter. *Summitt v. Com-*

*monwealth*, Ky., 550 S.W.2d 548 (1977), RCr 9.22.

■ Freddie next asserts that he was entitled to an instruction on theft by unlawful taking. Again trial counsel must not have thought Freddie was entitled to that instruction under the evidence. The following proceedings took place at the bench by the court:

"THE COURT: Will you gentlemen please approach the bench?

(Mr. Famularo and Mr. Towles complied.)

THE COURT: Do the attorneys have any objections to the Instructions?

MR. FAMULARO: No objections.

MR. TOWLES: I have no objections to the Instructions."

Because no instruction on theft by unlawful taking was requested, nor was objection to the instruction made, Freddie cannot now raise the issue on appeal. RCr 9.54; *Ray v. Commonwealth*, Ky., 550 S.W.2d 482 (1977).

■ The next point raised by Freddie alleges reversible error because of introduction of other criminal activity on his part.

During the testimony of Mr. Leach he explained that there was another couple from North Vernon, Indiana at the University Inn, "and they had had a few drinks there and they said: 'Well, we'll go down and get dressed and we'll pick you up and we'll go eat.' So he, this fellow (Freddie) took the car, said he'd bring back some women. When we came back there was two of them and they both had guns and the other couple had left. They didn't . . he had, in the meantime, robbed her of her purse while it was on the floor, about 30 or 40 dollars. But we didn't know anything about that until later on when we were eating, and she said, 'he robbed us. He robbed them too.' "

BY MR. TOWLES: "I object to that, your honor."

THE COURT: "Sustained."

MR. TOWLES: "Would request admonition."

THE COURT: "The jury is asked not to consider that as evidence because it is hearsay."

Freddie's counsel didn't request any further relief. He received all that he asked and cannot now complain. *Brown v. Commonwealth*, Ky., 449 S.W.2d 738 (1969); RCr 9.22.

■ Freddie also complains that the closing argument was so inflammatory and prejudicial as to deny him a fair trial. A reading of the closing argument refutes Freddie's contention. Part of the argument complained of is as follows:

MR. FAMULARO: "Punishment is for punishment's sake. Punishment and sentence in a penitentiary is more than that. It's to say to the man that did it: Don't do it again. But more than that, it's to say to all of these people in our community that are out there picking locks and rob and steal and make money easy and saying: I don't have to work for it. It's saying to those—your sentence here today is saying to those: Don't do it; we won't tolerate it. We're going to make this place a safe place, and we're going to stomp out people that rob at gunpoint.

"And this crime deserves more than the minimum punishment, Ladies and Gentlemen, for the simple reason that there is not a more potentially dangerous crime than that of armed robbery. If somebody moved the wrong way or if some innocent walked in an (sic) spoofed them, it wouldn't be a robbery here before you; it would be a murder. And for that potential danger, it deserves the maximum.

"I ask that you find this man guilty and impose the maximum of 20 years, and by that, attempt to stop this in our community. Thank you."

This court is of the opinion that the statement and remarks complained of do not constitute the giving of material testimony by the prosecutor such as to be a violation of the right to confrontation nor were the remarks an appeal to prejudice. There were other portions of the argument objected to, but this court is unable to find that an objection was made by Freddie's counsel to that portion of the argument quoted

above. In any event, the Commonwealth's Attorney is allowed reasonable latitude in argument to persuade the jurors the matter should not be dealt with lightly. *Harness v. Commonwealth*, Ky., 475 S.W.2d 485 (1972); *Richards v. Commonwealth*, Ky., 517 S.W.2d 237 (1974).

Freddie's final argument raised in a supplemental brief is that he was denied due process because the trial court overruled his motion for a pre-trial line-up. He admits however, that he does not have the constitutional right to a line-up and concedes that a granting of such a line-up is within the discretion of the trial court. This court is of the opinion that the validity of the photographic identification by Vance and Leach and the in-court identification of Freddie by all the victims were sufficiently tested during the trial. Freddie has not shown that the failure to grant his motion was an abuse of the trial court's discretion.

Fortune also smiled on Freddie. Actually under the provisions of KRS 505.020 Freddie was charged with three counts of armed robbery. The trial court, however, merged the three counts of first-degree robbery into one count over the objection of the Commonwealth's Attorney.

This court finds no error prejudicial to the substantial rights of Freddie Lynem.

The judgment is affirmed.

All concur.