David SMITH, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

Supreme Court of Kentucky.

April 2, 1987.

As Corrected April 6, 1987.

Rehearing Denied Sept. 3, 1987.

438

Kevin Michael McNally, M. Gail Robinson, Asst. Public Advocates Department of Public Advocacy, Frankfort, for appellant.

David L. Armstrong, Atty. Gen., Cicely Jaracz Lambert, Connie V. Malone, Asst. Attys. Gen., Frankfort, for appellee.

WINTERSHEIMER, Justice.

David Smith, a 32-year-old coalminer, was convicted of capital murder in the deaths of Becky Church, Amanda Church, Betty Maynard and Mary Thompson. Four death sentences were returned upon the jury verdicts.

This appeal is from a conviction on one count of intentional murder and three counts of transferred intentional murder pursuant to KRS 507.020(1)(a).

Smith argues that his punishment is the critical issue in this case. He presents forty-six allegations of error. The principal issues involve the composition of the grand and petit juries; the question of transferred intent in a multiple death situation; and the propriety of denial of funds for expert witnesses.

Smith grew despondent over news that his girlfriend was leaving him. Becky Church, the 17-year-old mother of the infant Amanda, had decided to stop living with Smith and to move to Ohio to live with her mother. After an 8-day separation, Becky returned with the intention of collecting her and Amanda's belongings from Smith's trailer. Their reunion was angry and unpleasant but relatively uneventful until approximately Midnight on September 4, 1980 when Smith arrived at the home of Becky's family. After a brief argument with Becky, Smith retrieved his 30/30 hunting rifle from the hedge where he had hidden it. Smith's first shot was in the air. His second bullet smashed through the door causing spraying fragments. His third shot passed through the front-door screen and struck Betty Maynard, Becky's half-sister, in the head. Smith then walked to the front door of the house. As he entered, Becky, along with Mary Thompson, Earl Thompson, Hie Maynard, and Maynard's two sons were in the bedroom. Earl attempted to close the bedroom door but Smith fired through it, fatally wounding Mary Thompson, Becky's mother. Becky said, "Oh Lord, what have I got you into Mom."

Smith then left the residence long enough for Becky to call for an ambulance and for that ambulance and another to arrive. While the ambulance attendants ministered to the two victims, Smith returned and appeared from the back of a second bedroom, shot Becky in the back and fired a final shot that struck her in the stomach when she turned. Amanda, the infant, who was in her mother's arms, was killed when the first bullet exited her mother's body.

Smith was taken to a state police cruiser where he stayed for approximately 2-½ hours. Between 4:50 a.m. and 5:10 a.m., he gave a confession. At trial Smith presented witnesses who testified that he was a substance abuser, specifically alcohol, co-

deine, librium and marijuana. He claimed the abuse began after hospitalization from a mining accident. Several witnesses who saw Smith prior to and after the shootings indicated that he appeared intoxicated as well as upset and crying. At the penalty phase of the trial, the prosecution relied on their guilt phase evidence. Smith offered sixteen witnesses in mitigation, including family and friends. The jury returned four guilty verdicts of intentional murder. At the conclusion of the penalty phase, the jury returned four death sentences based on the aggravating circumstance of multiple murders. This appeal followed.

The first seven arguments presented by Smith relate to the composition of both the grand jury and the petit jury as well as to the alleged underrepresentation of women and young adults in the jury pool and similar alleged underrepresentation in the selection of grand jury foreman and jury commissioners. His claim is that the jury pool from which the grand jurors were selected did not represent a fair cross-section of the community; that women and young people were underrepresented; that women and young people have been underrepresented as jury commissioners and grand jury foreman; that the jury pool from which petit jurors were selected underrepresented women and young people; and that neither the jury master list, nor the statute requiring the recording of juror excusals was properly maintained.

Smith's challenge of the composition of the grand jury due to an alleged underrepresentation of women and young people is nearly identical to the argument offered in *Ford v. Commonwealth*, Ky. 665 S.W.2d 304 (1984); cert. den. 469 U.S. 984, 105 S.Ct. 392, 83 L.Ed.2d 325. In *Ford* this Court reasoned that the grounds for challenging the composition of a jury pool from which a grand jury is selected is the equal protection clause of the Fourteenth Amendment to the United States Constitution and not the due-process requisites of the Fifth and Sixth Amendments, and that Ford, a black penitentiary inmate in his fifties, lacked standing to challenge the underrepresentation of women and young people. *Ford* held that in order to show that an

equal protection violation had occurred in the context of the grand jury selection, the defendant must demonstrate that the procedure employed resulted in a substantial underrepresentation of his race or of an identifiable group to which he belongs. *Ford, supra,* at 306. This result is the product of the unequivocal holdings in the equal protection cases of *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) and *Rose v. Mitchell*, 443 U.S. 545, 565, 99 S.Ct. 2993, 3005, 61 L.Ed.2d 739 (1979).

■ Smith, a 32–year-old white male, lacks standing under the equal protection clause to challenge the grand jury pool on the grounds that young people and women were underrepresented. He contends that *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); *Hobby v. U.S.*, 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984) are inconsistent with *Ford*. We disagree.

The U.S. Supreme Court in *Peters, supra*, did not discuss standing in the context of equal protection. *Hobby, supra,* evaluated the challenge of a white male to the underrepresentation of blacks and women in the position of grand jury foreman as a due process challenge. The Supreme Court's discussion in *Hobby* reaffirms the requirement that a petitioner must be a member of the race or group allegedly underrepresented in order to sustain an equal protection challenge.

Smith's next challenge to the composition of the jury concerns an alleged underrepresentation of women and young people as grand jury foremen. His argument is grounded in the Fifth Amendment to the federal constitution and Section 11 of the Kentucky Constitution.

*Hobby* assumed that discrimination entered into the selection of grand jury foremen in order to decide whether such discrimination warranted reversal of a conviction and dismissal of the indictment. The U.S. Supreme Court held that even if discrimination occurred in the appointment of a federal grand jury foreman, no violation of due process occurred as grounds for the

holding. The court reasoned that the duties of a federal grand jury foreman are largely clerical; that no individual can possibly represent all the qualities of human nature and the variations of human experience; and that the constitutional concern is the presence or absence of fundamental fairness.

RCr 5.04 provides that the members of the grand jury shall elect one of its members to be foreman. As further specified in RCr 5.04 and Administrative Procedure § 27, the only duty of the foreman is to administer an oath to each witness. KRS 29A.250.

■ As in *Hobby*, the ministerial trappings of the post carry with them no special powers or duties that affect the rights of persons that the grand jury charges with a crime, beyond those possessed by every member of that body. There was no denial of due process.

Smith makes a similar argument that the jury commissioners in Pike County suffered an underrepresentation of women and young people and that the indictment should be quashed and Smith's conviction reversed. The argument has no merit and Smith cites no authority. *See Ford.*

Smith now turns his attention away from the jury commission, grand jury foreman and grand jury to the petit jury and once again he complains of the underrepresentation of women and young people. *Ford* held that it is in the selection of the petit jury panels that the due process provisions of the federal and state constitutions appear, and it is required that the petit jurors be drawn from a fair cross-section of the community. *See Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The U.S. Supreme Court in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and this Court in *Ford* have held that in order to establish a prima facie violation of the fair cross-section requirement, the defendant must show 1) that the group alleged to be excluded is a distinctive group in the community; 2) that the representation of this group *in venires* from which the juries are selected is not fair and reasonable in relation to the num-

bers of other persons in the community; and 3) that the underrepresentation is due to the systematic exclusion of the group in the jury selection process.

■ *Ford* and *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519 (1984) considered in depth the claim that young adults comprise a cognizable and identifiable group. We held that they do not and followed the majority of federal and state authority in that respect. Therefore, in the case of young people, the underrepresentation complained of by Smith relates to a group not constitutionally cognizable with reference to jury pools.

■ Women do constitute a cognizable group at law, *Ford* and *Duren, supra,* and Smith contends that an underrepresentation of women in the selection of petit jurors denied him a jury drawn from a fair cross-section of the community. He relies on statistical data in support of his argument. The most revealing statistics in this case are that the petit jury which tried Smith was selected from 51 people, 29 of whom were women. Twenty-nine qualified jurors remained after the individual voir dire, 18 of which were women. Of the 14 jurors selected to hear the case, 11 of the 14 were women. After the removal of two alternate jurors, the final jury panel that found Smith guilty consisted of 3 men and 9 women. Smith's arguments fail for the reason that the third prong of *Duren* is not met. It requires that the defendant must show that the underrepresentation is due to systematic exclusion of the group in the jury selection process. In *Duren,* the underrepresentation of women was due to Missouri's automatic and/or statutory exemption for women. No such exemption exists in this state.

Furthermore, in support of his petit jury challenge, Smith relies on a random sampling of the jury pool over a five-year period, comparing that sample with the 1980 census of the county. *Ford* held that KRS 29A.040 fixed the eligible population for jury service as registered voters and property owners. Without a proper standard for comparison, there is no way to deter-

mine any significant representation. In Pike county, the data concerning the relevant population eligible to serve as jurors is significantly distorted by the presence of Pikeville College whose students are counted for census data but remain ineligible to serve as jurors. Therefore, Smith's data on the alleged underrepresentation of women fails the second requirement of *Duren.*

■ It was not reversible error for the trial judge to excuse jurors from the petit jury panel without consulting either defense or prosecution counsel and without recording reasons for excusing the jurors. There was no substantial deviation from the random jury selection process required by the statute and rules. *Robertson v. Commonwealth,* Ky. 597 S.W.2d 864 (1980). The jury was composed of a fair cross-section of the community.

Smith contends that the petit jury panel should have been dismissed because more than one of that group was excused without notice to the defense counsel or adequate documentation and because seven alleged "volunteer" holdover jurors were members of the panel.

Defense counsel is not entitled to be present and participate in the determination by the court at this preliminary stage of jury selection. The procedure used by the trial judge in excusing summoned jurors without any attorneys present was not improper under the statutes and procedural rules relating to jury selection. KRS 29A.080(1), 29A.100; II Ad.Proc. Sec. 9(5), 10 and 11(1). While the defendant and his counsel have a right to be present during the court's voir dire of the panel, the trial court is not required to allow any of the attorneys to actually question the potential jurors. RCr 8.28 & 9.38.

The jury which tried Smith came from panels summoned to appear on two April dates. The first list contained 133 names summoned to appear on April 4, 1983. No excuses or disqualifications were noted on that list, nor is it signed by the judge, and we do not consider it. Of the 133 names summoned, 34 were called for the trial. The second list contained 151 names summoned for April 18, 1983. Of the 151 names contained on the April 18 list, 71 were crossed out with various notations appearing after the name, i.e., medical, work, financial hardship, no transportation, etc. Forty percent of the original 284 names summoned for jury duty remained eligible for service. The conduct which appellant finds objectionable occurred prior to *voir dire.*

Defense counsel requested the jury qualification forms to which the court responded, "I don't know the questionnaires will have the reason on them. I try always to write the notation on them. Overruled."

There is no showing of a wrongful dismissal of any juror. The trial judge was aware of the statute regarding the excusing of jurors and the April 18 list shows that jurors were excused for proper reasons. The oversight of the trial judge in this instance in not listing the reasons for the jurors who were excused from the April 4 list does not amount to a substantial deviation from the statutorily required procedures. Smith has made no demonstration of prejudice resulting from this variation. Thus it does not constitute reversible error.

Smith also claims that the trial judge violated KRS 29A.070(7) by denying him access to the juror qualification forms of all the jurors summoned to appear during April.

■ It is not totally clear whether the statute and the administrative procedures apply to the jury qualification forms of all jurors summoned, those summoned but not excused by the trial judge upon their initial response, or for only those jurors making up the panel for a particular trial. In any event a defendant or his counsel's access to these forms is not unlimited because the statute vests jurisdiction in the trial judge to refuse access to the forms under certain circumstances. We cannot say that it was reversible error or an abuse of discretion for the trial judge to refuse to allow the forms to be used for further review.

The jury qualification form was not Smith's only avenue for attempting to gather evidence. The entire jury lists were

available to him and were submitted as exhibits in support of his motion. Smith is not entitled to reversal on this ground because he did not fully exhaust the means available to him and present the matter to the trial judge. *Romans v. Commonwealth*, Ky. 547 S.W.2d 128 (1977).

It is our view that the trial court substantially complied with the mandates requiring jury selection on the facts presented here. There was no prejudicial error.

■ The practice of permitting jurors who appeared for service one term to volunteer in a later term to serve out the remainder of their trial days does not amount to reversible error. We believe the issue to be a relatively minor one as to whether the 30 days jurors serve must be consecutive or limited to a calendar month or year. Smith insists that the issue was whether the jurors themselves may decide on whether they will return to complete their service. We are not convinced that there was a violation of procedure, and it is not reversible error. *Robertson, supra.*

■ The trial judge did not abuse his discretion by excusing juror Stacy. Smith argues that Stacy should not have been excused for cause. Stacy's wife was Smith's second cousin. The trial judge sustained the prosecution's motion to strike Stacy for cause. This was not an abuse of discretion.

RCr 9.36(1) provides that the trial judge shall excuse a juror when there is reasonable ground to believe that the prospective juror cannot render a fair and impartial verdict. The decision of whether to excuse for cause is within the sound discretion of the trial judge. *Peters v. Commonwealth*, Ky., 505 S.W.2d 764 (1974). Unless the action by the trial judge is clearly erroneous it will not be reversed on appeal. *Scruggs v. Commonwealth*, Ky., 566 S.W.2d 405 (1978); *Caldwell v. Commonwealth*, Ky., 634 S.W.2d 405 (1982). The right to challenge a prospective juror is the right to exclude a juror but not the right to require the service of a particular juror. 3 Wharton's Criminal Procedure (12th ed.) p. 244. During the preliminary voir dire examination in open court, the trial judge asked the prospective jurors if any of them were related by blood or marriage to the defendant. Stacy advised the court of his relationship and the judge questioned him further. Stacy responded that he would "rather not" sit. He was not excused at that time but the judge indicated that he would handle the matter on individual voir dire. Later Stacy indicated that it would not make any difference to him. The prosecution challenged the juror on the basis of implied bias because of his relationship by marriage to Smith. The trial judge excluded Stacy because of the possibility of kinship rendering him less than a fair and impartial juror. His decision was based on reason and was not reversible error. *See Randolph v. Commonwealth*, Ky., 716 S.W.2d 253 (1986).

■ There was no abuse of discretion in refusing to strike for cause six potential jurors who were either connected with law enforcement or had an alleged predisposition to the prosecution. Smith contends that by refusing to strike the jurors in question, the trial judge obliged him to use his peremptory challenges to remove them from the jury panel. Removal of these six jurors from the panel did not require Smith to use all his peremptory challenges, and he has not demonstrated that the use of these peremptory challenges resulted in a subsequent inability to remove further unacceptable jury panel members. *See Rigsby v. Commonwealth*, Ky., 495 S.W.2d 795 (1973).

Smith argues that the trial judge employed a double standard in ruling on prosecution challenges for cause of which seventeen were granted and those raised by the defense of which three of nine were allowed.

We do not see any pattern of judicial unfairness as inferred by the argument of Smith. Each of the jurors was ultimately removed by a defense peremptory challenge and Smith has failed to show that exhaustion of his peremptory challenges resulted in his inability to challenge other jurors. There was no bias or prejudice on the part of either the trial judge or on the

part of any of the individuals. The trial judge did not abuse his discretion by refusing to strike them from the panel. *Caldwell, supra.* There was no reversible error.

▮ It was not reversible error for the trial judge to refuse the defense request that the prosecutor disclose past and present relationships with prospective jurors. Smith was not denied an impartial jury because the trial judge overruled his pretrial request that the prosecutor reveal such relationships. He argues that the trial judge's refusal of this request resulted in his failure to strike from the jury a former secretary of the prosecutor and a part-time deputy sheriff.

The prosecutor's former secretary on voir dire admitted a long-standing acquaintance with and support of the prosecutor as well as the fact that she had worked for him. She stated that she would not be influenced as a juror because of the acquaintanceship.

The deputy sheriff stated on voir dire that he knew neither the prosecutor or his assistant. There is no evidence that the deputy was not truthful. There is no suggestion of a dishonest motive on the part of either juror or the prosecutor to intentionally conceal information in order to gain some sort of unfair advantage. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) provides that the key in any analysis of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith, supra*, at 219, 102 S.Ct. at 947. Neither juror gave false answers or misleading responses or deliberately concealed or withheld any information from the defense counsel. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) states in part that it remains the trial court's option to determine whether a post-trial hearing is necessary to determine juror bias or in *exceptional* circumstances that such a bias is to be inferred. The *Smith* test does not indicate any reversible error.

Here all we have is an affidavit of the defendant based on nothing more than discussion with two anonymous individuals amounting to only unsupported allegations which were not sufficient to require a hearing. There was no showing of actual juror bias or prejudice. Consequently there was no reversible error.

The trial judge did not commit reversible error when he refused to sequester potential jurors prior to their final acceptance during a three-day recess called to allow the parties to decide on their peremptory challenges. Smith maintains that in addition to sequestration, the potential jurors should have been denied access to any news reports concerning sentencing in a capital murder case in a neighboring county and an execution in Alabama. RCr 9.66 provides that sequestration of the jury is discretionary until the case is submitted to the jury for their deliberations.

Jurors should not be considered as prisoners of the court, the system or the defendant. Here the trial judge admonished each potential juror after individual questioning not to discuss the case. There is no authority which would allow a trial judge to deny jurors the right to information unrelated to the particular case which they may be considering. Equally, there is no authority for sequestering potential jurors prior to their selection.

▮ There was no abuse of discretion by the trial judge in refusing to sequester the entire panel of qualified potential jurors and there was no reversible error in his decision.

The trial judge properly overruled defense motions for a change of venue, funds for a public opinion survey and additional peremptory challenges. Similar claims for a change of venue based on pretrial publicity have been rejected in *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980) and *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384 (1985). There was no abuse of discretion in refusing additional peremptory strikes. RCr 9.40(3); *Brewster v. Commonwealth*, Ky., 568 S.W.2d 232 (1978).

Smith argues that the trial judge should have directed a verdict on three counts of transferred intentional murder because he

was acquitted of the intentional murder of Amanda, Betty and Mary, and it is he claims a violation of the statute, double jeopardy and due process to transfer intent to kill Becky to support four different intentional murders. He maintains that the sole issue in this case is the consideration of punishment.

He makes no argument challenging the validity of the doctrine of "transferred intent" as codified in the Kentucky Revised Statutes; the challenge lies only in its application to him.

The standard for considering a directed verdict in any case was expressed in *Trowel v. Commonwealth*, Ky., 550 S.W.2d 530 (1977).

> If under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal.

The trial judge is not permitted to take a case from the jury by a directed verdict unless facts are not in dispute or the proof is such that fair-minded persons would not differ about them. The motion was properly overruled.

▉ KRS 507.020(1)(a) as it applies to Smith, does not violate the statutory scheme, the double jeopardy clause of state and federal constitutions and due process of law. The statute provides a person is guilty of murder when with intent to cause the death of another person, he causes the death of such person or of a third person.

The jury found Smith guilty of intentionally murdering Becky Church and guilty of murdering the others through the doctrine of transferred intent. He does not dispute intentionally killing Becky Church. Instead, he claims that KRS 507.020(1)(a), i.e., the "transferred intent" is being utilized as the sole aggravating circumstance upon which the death penalty is being imposed, and that the legislature did not intend transferred intent to apply in a homicide case when the accused succeeds in killing the primary intended victim.

The 1974 commentary to KRS 507.-020(1)(a) provides that, "[w]hen read with the definition of 'intentionally' in KRS 501.-020, KRS 507.020(1)(a) designates as murder a homicide that results from the *conduct* of a person whose conscious objective is to cause another's death."

Smith entertained the single objective to kill Becky Church. This is uncontroverted, even admitted by him. After firing the shots that killed the first two victims, he left the premises long enough for two ambulances to make the 10 to 12 minute trip to the scene of the shootings. While ambulance attendants ministered to the bodies of Mary Thompson and Betty Maynard, he reappeared from a back bedroom. At point-blank range, Smith lifted his 30/30 hunting rifle and shot Becky Church in the back. The jury apparently believed this shot exited the body of Becky and penetrated the body of Amanda. He fired a second shot into Becky's stomach. His conscious objective to cause Becky Church's death and his course of conduct in pursuit of that objective, resulted in the deaths of four persons. *See* KRS 507.020(1)(a).

The language of KRS 507.020(1)(a) does not make mutually exclusive the death of the intended victim and the death of the unintended victim. Smith would have this Court hold that the use of the word "or," (KRS 507.020(1)(a)) "A person is guilty of murder when with intent to cause the death of another person, he causes the death of such person *or* of a third person," makes it clear that when a defendant succeeds in killing his intended victim, he cannot be found to have intended the deaths of the innocent bystanders he killed in pursuit of his victim. His acts of killing Amanda, Betty and Mary, while intending to kill Becky, would be intentional murders. Even in the absence of KRS 507.020(1)(a) dealing specifically with murder, the same result would be obtained under KRS 501.-060(2)(a) which provides:

> When intentionally causing a particular result is an element of an offense, the element is not established if the actual result is not within the intention or the contemplation of the actor unless:
>
> The actual result differs from that intended or contemplated, as the case may be, only in the respect that a different person or different property is injured or

affected or that the injury or harm intended or contemplated would have been more serious or more extensive.

Smith first killed Betty Maynard with a shot he fired intending to kill Becky. He fired another shot trying to kill Becky but instead killed Mary Thompson. He then killed Amanda with a shot intended to kill Becky. Smith's intent and culpability for each of the killings were determined at the time he fired.

Smith would be rewarded for continuing the carnage if his theory is accepted. He does not challenge KRS 507.020(1)(a) "transferred intent" if the intended victim escapes death. Therefore, had Smith killed Mary Thompson and Betty Maynard and retreated permanently instead of regrouping for another attack, the doctrine of transferred intent, KRS 507.020(1)(a), would hold him responsible for two intentional murders and the death penalty would be a possibility. See 532.025(2)(a)(6). However, his argument is that because he finally killed the person he intended to kill, all other deaths in pursuit of his objective would not be intentional. Therefore the death penalty is not a possibility.

This convolution of logic cannot be the legislature's intent. The statutory construction of KRS 507.020(1)(a) does not prohibit prosecution for intentional murder of a contemporaneous unintended victim where the intended victim is also successfully murdered.

Smith's argument that the transferred intent doctrine violates constitutional double jeopardy principles is without merit. The double jeopardy clause is to prevent multiple prosecutions for one act; U.S. v. DiFrancesco, 449 U.S. 117, 129, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980), not to prevent the state from separately punishing the killing of two or more people. Kentucky has long held that a single act which affects multiple victims constitutes multiple criminal offenses. See: Keeton v. Commonwealth, 92 Ky. 522, 18 S.W. 359 (1892); Commonwealth v. Browning, 146 Ky. 770, 143 S.W. 407 (1912); Commonwealth v. Anderson, 169 Ky. 372, 183 S.W. 898 (1916) recognizing applicability where

two persons were wounded by the same shot; Wallace v. Commonwealth, 207 Ky. 122, 268 S.W. 809 (1925), recognizing applicability where two persons were wounded by the same bullet; Canada v. Commonwealth, 242 Ky. 71, 45 S.W.2d 834 (1932) recognizing applicability where two persons were wounded by the same shot. Annot., Single Act Affecting Multiple Victims as Constituting Multiple Assault or Homicides, 8 A.L.R.4th 960, 964 (1981).

Inasmuch as the doctrine of transferred intent (KRS 507.020(1)(a)) is properly applicable to the facts in this case, the issue of whether or not the legislature intended the death penalty to be a possibility for one intentional murder contemporaneous with a lesser type of homicide such as wanton murder or reckless homicide is not before this Court.

The trial judge properly admitted autopsy reports and properly denied funds to the defendant to hire a defense pathologist or take the deposition of a medical examiner who performed the autopsies. The autopsy reports were admissible under KRS 72.260, and in view of that statute and the limited purposes for which autopsy reports can be admitted, admission of the reports without ordering funds for the appearance or deposition of the medical examiner was not error.

■ Smith was not denied a fair trial by the refusal of the trial judge to order funds for a crime scene or ballistics expert. State facilities were available to him for this use. KRS 31.185; Perry County Fiscal Court v. Commonwealth, Ky. 674 S.W.2d 954 (1984).

Here Smith seeks to prove his mental state by the testimony of either a ballistics expert or a crime scene reconstruction witness. In a similar case involving the request to employ a psychiatrist in the penalty phase of a capital murder case, this Court refused to give a defendant the right to a psychiatric fishing expedition at public expense or an in-depth analysis on matters irrelevant to the legal defense of a crime. See Kordenbrock, supra. We do not believe that the expert assistance Smith claims he needed had anything to do with

his defense which was that the murders were wanton, rather than intentional. The evidence he believed he needed was available through the use of state experts and facilities. He did not take advantage of the assistance available. At trial he cross-examined both the firearms examiner and the police sergeant in charge of the investigation of the homicides. The firearms examiner indicated that he had discussed the case with and cooperated with the defense attorney. Under the circumstances, it does not appear that the services of an independent ballistics expert were reasonably necessary. *Hicks v. Commonwealth,* Ky., 670 S.W.2d 837 (1984).

The conduct of the prosecutor did not deprive Smith of a fair trial and did not amount to reversible error.

The opening statement by the prosecution, although vigorous and perhaps somewhat emotional and the gun demonstration included in it, only directed the attention of the jury to the evidence which he expected to prove through the testimony. The explanation of the incident and the demonstration were ultimately supported by the testimony of witness Maynard. His prediction as to what the jury might think did not amount to reversible error.

We are not convinced that the prosecutor harassed or humiliated defense counsel. Any demonstration of rudeness or bad manners in the courtroom is usually counter-productive. If the prosecutor was guilty of such conduct, it did not influence the jury.

The claim of a leading question to police officer Forsythe does not demonstrate reversible error. The other remarks of the prosecutor complained of by Smith were objected to by defense counsel. The objections were sustained and in one case in which an admonition was required, it was rendered. In the instance in which the jury was not admonished after an objection, it was clear from examining the record that the objection had been sustained and the witness was not allowed to answer the question. The line of questioning was not pursued. The claims of prosecutorial misconduct are not sufficient to deny Smith a

fair trial. They are a little more than an attempt to flyspeck the record.

The redirect examination of officer Forsythe was not reversible error. The questions were not leading to the extent that they resulted in any prejudice or unfairness to the accused. There was no reversible error in allowing the redirect examination.

There was no error in the manner in which physical evidence and photographs of the crime scene and victims were introduced and handled.

The prosecutor did not overstep the bounds of propriety in his closing argument at the guilt phase of the trial. The closing argument is not improper merely because the prosecutor may become emotional and refer to the feelings of the victims' families. *See McQueen v. Commonwealth,* Ky., 669 S.W.2d 519 (1984). None of the comments by the prosecutor merits reversal. The closing argument by the prosecutor was relatively restrained for a case of such magnitude. The argument occupied only seven pages in the transcript. The argument by defense counsel was fifty-three pages long.

 If any of the isolated comments or remarks were improper, in view of the overwhelming evidence of guilt and the seriousness of the crime, no prejudice could possibly have resulted and there is no reversible error. *Rigsby v. Commonwealth,* Ky., 495 S.W.2d 795 (1973).

 Smith's argument that he was denied the opportunity to impeach Detective Forsythe on the grounds of a prior inconsistent statement is without merit. The officer's past or present opinion on the guilt of the defendant was inadmissible. The only possible claim was that it was inconsistent with the prosecution's theory of the case. This is not the type of inconsistency contemplated by the rules governing impeachment by a prior inconsistent statement.

The trial judge's rulings on lay-opinion evidence did not deny Smith his right to present a defense. The trial judge correctly excluded lay opinions which were irrelevant. The trial judge's refusal to permit

impeachment on collateral matters was also proper.

It was not reversible error for the trial judge to exclude irrelevant evidence of the pattern of drug use by Smith. Smith sought to introduce evidence concerning his illegal use of drugs during a two-year period before the murders in an attempt to mitigate the effects of his crimes. He claims that evidence establishing this pattern was necessary to show that he was under the influence of drugs and alcohol at the time of the killings. He argues that his defense was that he acted under extreme emotional disturbance when he killed the victim and that his consumption of drugs and alcohol, and their effect on him during the time leading up to the killings, was clearly relevant to his mental state that night. We are not convinced.

Smith was not prohibited from introducing evidence of his prior drug use. He was not prejudiced by the inability of the chemist to give expert testimony.

The instructions in the guilt phase of the trial were not reversible error. The instructions were sufficient in that they set out extreme emotional disturbance and the trial judge did not err in refusing to define that term.

This Court has only recently clarified the definition of extreme emotional disturbance in *McClellan v. Commonwealth*, Ky., 715 S.W.2d 464 (1986). *Hale v. Commonwealth*, Ky., rendered 12/18/86, provides that the application of the definition of extreme emotional disturbance established by *McClellan, supra*, shall be prospective and not retroactive.

The instructions sufficiently set out the requirement that the extreme emotional disturbance be determined from the view of the defendant. The language of the instructions is exactly as set out in Palmore and Lawson, *Kentucky Instructions to Juries* § 201, Instructions 1 and 5. The instructions meet the goal of submitting the applicable law in a form that can be readily understood by the jury. In an already confusing area which has befuddled lawyers and judges for years, the instruction here may in fact be less confusing than the language of the statute.

The determination of the existence of extreme emotional disturbance is within the facts and circumstances of each particular case. We cannot fault the trial judge for declining to define it in this situation. The judge was not in error in refusing the instructions offered by the defendant. The offered instruction could have been more harmful to the defendant.

The instructions tendered by Smith on the effect of inconsistent statements by witnesses need not have been given because instructions should not be given which relate to the credibility of witnesses or which might invade the province of the jury in determining such credibility.

There was no reversible error in the admission of Smith's voluntary confession by the trial court. He now claims that at the time of his confession he was intoxicated, emotionally distraught and exhausted. He also alleges that the *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warnings he was given were defective and that there was an unnecessary delay in taking him before a judge and that he was not afforded a full hearing on his motion to suppress.

An examination of the record indicates that Smith confessed of his own free will. He was arrested at the scene of the crime at approximately 1:55 a.m. on September 4, 1980. He was given his *Miranda* rights by a deputy sheriff when he was arrested. Shortly after the arrest Smith was put in the back of a police cruiser where he remained until 3:30 a.m. No attempt was made to question him, and he did not speak while he was being transported from the scene of the crime to Pikeville. As soon as he arrived at the office of the county jail, he was again read *Miranda* rights and he indicated that he understood and signed a form waiving the rights. The assistant prosecutor arrived on the scene at approximately 4:50 a.m. and he again explained the *Miranda* rights to Smith who told him that he understood and that he was willing to tell what happened. Smith

made a tape recorded statement which ended at 5:10 a.m.

He now claims that his confession was involuntary and arose from his alleged intoxication, emotional distress and exhaustion. He contends that his behavior at the scene of the crime three hours before he gave his confession was an influencing fact. Testimony from those examining him and observing him at the time of the confession indicates that he was calm and collected and that he smoked cigarettes, drank coffee and a coke. He was able to respond coherently and intelligently to the questions and gave detailed descriptions of family relationships and the scene of the crime. The *Miranda* warnings were clear, adequate and sufficient. We do not find any merit in the contention that his confession was the result of an unnecessary delay in bringing him before a district judge.

■ There was no reversible error because he was denied funds to obtain the testimony of a psychologist regarding his intelligence. Nothing in his behavior or in the content of his confession indicates his inability to understand. There was no showing that the assistance of an expert would produce anything that was reasonably necessary for his defense.

■ Smith was not denied his right to a speedy trial by virtue of the fact that there was a lapse of two and a half years between his indictment and trial.

The delay in bringing Smith to trial was not unnecessarily long in view of his trial and conviction on a charge of escape. The prosecution made a number of good faith efforts to have the case set for trial. Almost one year of his incarceration can be attributed to his service of the 12–month sentence on the escape conviction. The prosecution filed four motions requesting that the case be set for trial. Smith failed to request a speedy trial during a period in excess of two years. Smith also helped contribute to the delay by pursuing a number of lengthy and complex pretrial motions.

There is no specific demonstration of prejudice to the preparation of his defense

as a result of any pretrial delays. A functional analysis of the right to a speedy trial in the peculiar context of this case reveals that Smith was not denied his constitutional right. *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

■ The trial court correctly refused to order the deposition of the two sons of the victim Betty Maynard. At the time of the trial the boys were 13 and 10 years of age. Smith made absolutely no showing that they were unavailable or unable to attend the trial. There is no showing that they were nonresidents. This argument is without merit.

It was not reversible error for the trial judge to refuse what Smith calls adequate payment so that any of the three psychiatrists or two psychologists who examined him could testify as to mitigation during the penalty phase at the presentence hearing. Our examination of the record indicates that Smith received the reasonably necessary expert assistance to which he was entitled. *Young v. Commonwealth,* Ky., 585 S.W.2d 378 (1979).

In October, 1980, Smith requested funds for a psychological evaluation in the amount of $433, because he did not know until the results came back whether he would need funds for testimony. On January 28, 1981, the trial judge sustained the motion, but limited it to $500 paid by the Pike Fiscal Court. On March 13, 1981, Smith was sent to Ashland where he was evaluated by Dr. Hutchings. Approximately one year later, after Smith had given and withdrawn his notice of intent to rely on the defense of mental disease or defect, the trial judge granted his request to be examined by psychiatrist, Dr. Granacher.

■ We are not convinced that any reversible error occurred in the trial court's disposition of the request for funds despite the spirited and detailed argument presented by counsel for Smith. He received as much as he was entitled to under KRS 31.100. He did not rely on or pursue an insanity defense and the record is devoid of any indication of mental disease or defect.

*See Rackley v. Commonwealth,* Ky., 674 S.W.2d 512 (1984).

*Lockett v. Ohio,* 438 U.S. 586, 89 S.Ct. 2954, 57 L.Ed.2d 973 (1978) is not applicable because the judge and the jury were permitted to consider the mitigating factor of intoxication and drug abuse, the effect of the mining accident, Smith's affection for his child and the child's mother, and his unemployment which were presented in evidence by his family and friends. He is not entitled to funds for a psychiatric fishing expedition or analysis of matters irrelevant to a legal defense. *See Kordenbrock, supra.*

The refusal of the trial judge to approve funds for the live testimony of Dr. Gergen, the prosecution's psychiatrist, was not reversible error. There was no violation of the rights of Smith regarding equal protection, due process, or the right of confrontation or the right against compulsory self-incrimination.

■ Smith was properly sentenced to death for four killings under the aggravating circumstance of multiple murders. The convictions based on a transferred intent were proper because the evidence indicated that he shot the other three victims while intending to kill Rebecca Church. He was correctly sentenced to death for each of the four murders based on the aggravating factor that his act or acts of killing were intentional and resulted in multiple deaths.

The argument that his four death sentences must be set aside based on the theory that the aggravating circumstance of multiple deaths cannot support the three murder convictions based on transferred intent is without merit.

KRS 507.020(1)(a) defines murder as an act when, with intent to cause the death of another person, the defendant causes the death of such person or of a third person. KRS 507.020(1)(a) incorporates the KRS 501.020(1) definition of intent which is that a person acts intentionally with respect to the result or to conduct described by a statute defining an offense when his conscious objective is to cause that result or to engage in that conduct with KRS 501.060.

Smith's acts of killing Mary Thompson, Betty Maynard and Amanda Church while intending to kill Rebecca Church was intentional murder pursuant to KRS 507.020, 501.020, and 501.060, and is punishable by death. KRS 507.020(2). He is also guilty of the aggravating factor of KRS 532.-025(2)(a)(6) as his acts of killing were intentional and resulted in multiple deaths.

The argument that the jury verdict that Smith intended to only kill one person precludes a finding of intentional multiple murders and bars the death penalty is unconvincing. The authorities presented by Smith are unpersuasive. The evidence indicates that he went to the house and shot through the screen door at Rebecca, killing Betty. He then shot again at Rebecca in the bedroom and killed Mary. Then he left the house briefly only to return and shoot Rebecca twice and Amanda once, killing them both. His intent to kill is abundantly clear. There is no doubt that his acts of killing were intentional and resulted in multiple deaths. The death sentences were proper.

■ The contention that Smith was denied rational sentencing and due process because the penalty phase instructions failed to require findings regarding mitigating factors and because there were no specific findings is unconvincing. *Smith v. Commonwealth,* Ky., 599 S.W.2d 900 (1980) and *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985) hold that neither the judge nor the jury is constitutionally required to make specific findings as to mitigating circumstances. His death sentence is not unconstitutional because the trial judge and the jury failed to make findings. *See* KRS 532.025.

■ It was not error for the trial judge to refuse to allow testimony with regard to the impact of the death penalty on Smith's family and friends as well as the victims's families. The exclusion of this kind of testimony did not deprive him of a fair and rational sentencing. *Lockett v. Ohio, supra,* provides that nonstatutory mitigating evidence must be admitted only if it is relevant to the defendant's character, record or any of the circumstances of the

offense. The evidence proffered by avowal is similar to the emotional evidence disapproved in *Ice v. Commonwealth*, Ky., 667 S.W.2d 671 (1984) and *McQueen v. Commonwealth, supra*. The statements constituted an improper comment on the consequences of a verdict. *Payne v. Commonwealth*, Ky., 623 S.W.2d 867 (1981). The impact statements of the victims' families as regards Smith were also properly excluded.

Smith's argument that he was deprived of a fair penalty trial by the action of the trial judge in providing allegedly different and unnecessary courtroom procedures after the jury verdict is unconvincing. The argument that the entrance and exit by the jury from the courthouse to the jury room by the shortest route gave rise to an implied fear for their lives is not supported by the record. There is no foundation for the charge that prejudice occurred in rendering the verdict or that it contributed in any way to the ultimate death sentence.

■■■ Smith was not deprived of a fair trial and rational sentencing by the alleged misconduct of the prosecutor during the penalty phase.

*United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), provides that the prosecutor's statements or conduct must be viewed in the context of the trial and only by so doing can it be determined whether the conduct affected the fairness of the trial. A reviewing court must consider the impact of the remarks of the prosecutor's balanced against those of the defense counsel because a criminal conviction should not be lightly overturned on the basis of the prosecutor's comments only. *See Niemeyer v. Commonwealth*, Ky., 533 S.W.2d 218 (1976). The style and approach to the presentation in the courtroom is different, but we find that considering the two together, they are able and aggressive adversaries who sought legitimate tactical advantage as the case developed. In view of the fact that they merely present opposing points of view, styles and techniques, it is our opinion that the jury was not unduly influenced by either counsel.

The prosecutor's argument was relatively short, consisting of five pages in the transcript. When considered in context, the arguments of the prosecutor are within the bounds permitted. *Lynem v. Commonwealth*, Ky., 565 S.W.2d 141, 144–145 (1978). The prosecutor did not coerce the jury by implying that they could shirk their responsibility by returning a sentence of less than death. He did not improperly present his personal opinion when considered in the totality of the circumstances. Defense counsel presented his own opinion when he said it is wrong to kill in reference to the death penalty.

Smith received a fair trial and that is the standard which applies. This case does not rise or fall on the culpability or conduct of the prosecutor. *Smith v. Phillips, supra.* Absent the alleged misconduct of the prosecutor, we cannot say the verdict would have been any different. *United States v. Hasting*, 461 U.S. 499, 507–510, 103 S.Ct. 1974, 1979–1981, 76 L.Ed.2d 96, 105–107 (1983). The legal authorities presented by Smith are unpersuasive.

There is no reversible error in regard to the instruction of the jury about the mitigating factors of intoxication and lack of significant history of prior criminal activity.

The instructions given during the penalty phase were proper. Similar instructions have been approved in *Smith v. Commonwealth*, Ky., 599 S.W.2d 900 (1980) and *Skaggs, supra.* The role of mitigation was enunciated in *Harper v. Commonwealth*, Ky., 694 S.W.2d 665 (1985). There is no requirement of a burden of proof instruction beyond instructing the jury that it must find aggravating circumstances beyond a reasonable doubt. *Gall, supra.* The jury was properly not advised of parole. *Skaggs, supra; Farmer v. Commonwealth*, Ky., 450 S.W.2d 494 (1970). The instructions properly achieved the narrowing and individualized determination required by the constitution.

Smith's death sentence was not inappropriate, arbitrary, cruel, unusual or disproportionate. The death penalty statute was constitutionally applied to him. The argu-

ment that his mitigating circumstances outweigh the one aggravating circumstance and that his death sentence is disproportionate to a list of unpublished cases has been previously rejected in *White v. Commonwealth*, Ky., 671 S.W.2d 241 (1983) and *McQueen, supra* and *Skaggs, supra.* The imposition of the death sentences was supported by the evidence.

In making the review required by KRS 532.075(3), we find nothing in the record to show that Smith's sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. The death sentence is not excessive or disproportionate to the penalty imposed in similar cases since 1970, considering both the crime and the defendant.

Those cases have been previously recited by this Court in *Marlowe v. Commonwealth*, Ky., 709 S.W.2d 424 (1986) and that list is incorporated herein in accordance with KRS 532.075(5). In addition we have also considered the more recent cases of *McClellan v. Commonwealth*, Ky., 715 S.W.2d 464 (1986), *Matthews v. Commonwealth*, Ky., 709 S.W.2d 414 (1986) and *Bevins v. Commonwealth*, Ky., 712 S.W.2d 932 (1986). We have conducted an independent review of these circumstances and conclude that they exceed any minimum justifying capital punishment.

The trial judge properly denied admission of evidence concerning other multiple murder cases.

Smith's contention that the trial judge and prosecutor misled the jury by emphasizing that the sentence was only a recommendation is unconvincing. Our review of the record indicates that the references to the jury sentence as a recommendation were unaccompanied by any message that the responsibility of the jury was lessened in any way. Mere use of the word recommendation does not constitute reversible error. The jury was fully and properly informed of its responsibilities.

It was not reversible error for the trial judge to excuse three prospective jurors for cause because of their views against the imposition of the death penalty.

The answers of the three prospective jurors during individual voir dire examination indicates that their views on the death penalty would have prevented or substantially impaired their performance of jury duty. They were properly excused.

The exclusion for cause of fourteen veniremen and six more by peremptory challenge because of their views concerning the death penalty did not deny Smith an impartial jury. This practice did not result in the selection of an unrepresentative jury which was more prone to convict and give the death penalty than one otherwise selected. The sentence qualifying of the jury did not deprive Smith of a fair and impartial jury selected from a fair cross-section of the community.

The trial judge did not deny Smith due process and equal protection by refusing $100 for expenses for a deposition of a professor of ethics and an Episcopalian minister. In the penalty phase, Smith called sixteen witnesses including family, friends and employers who testified in his behalf. The authorities presented by Smith in this argument are unpersuasive.

*Moore v. Commonwealth*, Ky. 634 S.W.2d 426, 434–435 (1982) does not apply to the proffered testimony in this case because the witnesses would have had to limit their testimony to relevant mitigating factors. Smith argues that the testimony would have related to his character and personality and how his background and qualities should be taken into consideration in the life/death decision.

The refusal of the trial judge to admit evidence regarding the nature and effect of electrocution was proper.

The argument by Smith that the Kentucky death penalty statute violates the federal and state constitution is without merit and it has been repeatedly rejected by this Court. *Skaggs, supra.*

The death penalty statute of Kentucky does not operate in an arbitrary, discriminatory or freakish manner. This type of argument has been repeatedly rejected by this Court. *Skaggs, supra.*

Smith is not entitled to the data collected by this Court pursuant to KRS 532.075(6). *See Harper v. Commonwealth,* Ky. 694 S.W.2d 665, 670–671 (1985).

The trial judge properly refused to exclude the death penalty on the basis that electrocution constitutes cruel and unusual punishment. Again this argument has been frequently rejected by this Court. *White, supra.*

■ There was no need to have the trial judge recused because he had engaged in an *ex parte* conversation about alleged unrelated criminal conduct by Smith. The action of the judge in setting a sentencing date on the last day to file a new trial motion as well as examining the psychiatrist's report which was not used at trial, and transferring Smith to another jail does not constitute the expression of an opinion concerning the merits of the case which requires recusal pursuant to KRS 26A.015(2)(a).

The procedure used by the trial judge in filing his report did not deprive Smith of effective assistance of counsel or due process. Defense counsel was given ample opportunity to and did respond to the trial judge's report. His objections were attached thereto.

Considering the case as a whole we find no unfairness in the trial situation. Therefore the judgment is affirmed.

STEPHENS, C.J., and GANT and STEPHENSON, JJ., concur.

VANCE, J., concurs in result by separate opinion.

LEIBSON, J., dissents by separate opinion.

LAMBERT, J., joins in his dissent.

VANCE, Justice, concurring.

I concur in the result although I am disturbed by what appears to be a failure of compliance with the jury selection procedures set forth in K.R.S. 29A.070 and K.R.S. 29A.080. I find no reason, however, to believe that the failure to comply with the notations required by those statutes had any effect upon the trial of this appellant.

K.R.S. 29A.070 requires that all prospective jurors be required to indicate on a juror qualification form sufficient information to determine if they are statutorily disqualified from jury service. If they are so disqualified, the trial judge is required to note this fact on the juror qualification form and on the list of names drawn from the jury wheel. The obvious purpose of this procedure is to guarantee that no person shall serve on a jury who is disqualified by statute. There is no complaint in this case that any disqualified person actually sat on the jury.

K.R.S. 29A.100 authorizes a trial judge to excuse from those jurors remaining on the lists after the statutory disqualifications any juror upon a showing of undue hardship, extreme inconvenience, or public necessity.

The complaint here is that the notations on the jury lists, or the lack thereof, are not sufficient to determine whether or not the trial judge abused his discretion by excusing many jurors from service who did not show undue hardship, extreme inconvenience, or public necessity.

Nevertheless, there is not a showing here that the jury pool from which the jury was drawn, or the jurors who actually heard the case, did not represent a fair cross section of the community.

If a trial judge abuses his authority and violates K.R.S. 29A.100 by wholesale excuses from the jury list without a showing of undue hardship, extreme inconvenience, or public necessity, sanctions for the violation may be in order, but there is no reason to reverse the verdict absent a showing that the jury panel which actually heard the case was not fairly constituted.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

The defendant was on trial, for a hideous and sensationalistic crime which received wide publicity, in a rural and sparsely populated area. Nevertheless, as does every defendant accused of a criminal offense, he

had a constitutional right to be tried before a fair and impartial jury and to question the methods being used by the trial court to insure that such a jury is selected.

In order to preserve this basic constitutional right, the Kentucky legislature has statutorily mandated procedures for jury selection which, when followed, guarantee a defendant a trial before an impartial jury drafted from the community by lot rather than a jury of volunteers who may well be acting as vigilantes.

The principal substantial violation in the jury selection procedure was the failure to follow the provisions of KRS 29A.070 and .080 which relate to the use of juror qualification forms. KRS 29A.070 mandates that the circuit judge shall cause the jury qualification forms to be furnished to prospective jurors, who shall complete them faithfully under pain of criminal penalty. It provides a follow-up method to the circuit judge to be sure the completed forms are returned. *See* also II Ad.Proc., Jury Selection and Management, §§ 9–11.

KRS 29A.080(1) requires the judge to "enter" on the juror disqualification form, as well as on the list of names drawn from the jury wheel, the reasons for disqualification.

KRS 29A.070(7) follows up on this by requiring that the "contents of juror qualification forms shall be made available to parties or their attorneys of record," with an exception not relevant here.

Thus a written reason, offered by the juror asking to be excused, and the judge's ruling are both preserved in writing and available to the lawyer so he can verify that the jury panel consists of persons drafted for jury service rather than persons who are volunteers.

No valid reason was given to deny the defendant access to the jury qualification forms. The failure to do so was a substantial defect in the jury selection procedure.

There are two lists of names drawn from the jury wheel in the record, one for April 4 and one for April 18, with incomplete notations on one of the two lists as to the reasons why some of the jurors (not all)

were excused. Rather than curing the problem, this exacerbates it. With one list there is no way for defense counsel to know why the jurors were excused. In the second instance, where there are only vague notations, such as "med" by the names of 35 of the 71 excused jurors and "work" by the names of 14 of those excused, there is no way for the lawyer to know what the juror wrote out as the underlying facts which made the offer of a reason to avoid jury service sufficient to excuse him.

Finally, in response to defense counsel's objection that some jurors were excused in order to keep a medical or dental appointment the judge asked, incredulously, "You don't want the jurors to keep their doctor appointments ' and their dental appointments as they accrue ... ?" It is hardly credible that jurors were excused from a month of jury service over the fact of such an appointment, which normally can be easily changed. Once again, this illustrates a lack of substantial compliance with the required jury selection procedures, rather than the opposite.

There is no right more fundamental to the success of the criminal justice system than the right to be tried by an impartial jury. That is the reason for the statutes, and the reason for requiring compliance with those statutes. In *Robertson v. Commonwealth*, Ky., 597 S.W.2d 864 (1980), we held that a criminal conviction should be reversed where the trial court deviated substantially from statutorily required random jury selection procedures even though the defendant showed no prejudice resulting from the manner in which the jury was selected. If the record is insufficient to show that a violation was only technical, and not substantial, the case should be reversed. The majority opinion erroneously places the burden on the defendant to show that he was prejudiced by some violation.

The court's error in excusing jurors without adequate cause was compounded by the policy of permitting, but not requiring, jurors who appeared for service one term to volunteer to return at a later term to serve out their "judicial days." There were 24 volunteer holdover jurors with the nota-

tion "the following are returning from other terms to finish their judicial days." Seven of these "holdover jurors" served on Smith's jury. Common sense tells us that individuals who want to keep serving on juries, particularly when a *notorious* case is coming up for trial, are less likely to constitute a neutral jury. A procedure that *requires* excused jurors who do not complete their term of service to return to do so at a time specified when they are excused, is acceptable. A procedure that *permits* jurors to return if they elect to do so, and, even worse, permits them to select them when to return, is not acceptable. It is incumbent upon our Court to stop such a pernicious practice, and to do so right now, and in this case. We are condoning a method of jury selection which is diametrically opposed to the concept of citizens drafted by lot from a cross-section of the community, which is the essential underpinning of the constitutionally protected right to a fair and impartial jury.

Smith requested funds to pay a psychologist or psychiatrist to testify during the death penalty phase in regard to results of earlier testing and to offer expert opinion as to the effect of intoxication and extreme emotional disturbance on Smith at the time of the crime as mitigating circumstances. Five experts were named in the request for funds, including Dr. Gergen, the Commonwealth's expert. However, the trial court refused to order funds for any other expert except a Dr. Granacher who refused to come to court because an earlier examination was unpaid for.

KRS 31.110(1)(b) provides that indigent defendants are entitled "to be provided with the necessary services and facilities of representation including investigation and other preparation." Psychiatric or psychological assistance was reasonably necessary to the defense in this capital case. *Young v. Commonwealth*, Ky., 585 S.W.2d 378 (1979). In fact, by ordering funds to pay Dr. Granacher's fee to testify in court, the trial court determined the necessity of this assistance. At the same time, by limiting the payment of the fee to an expert who clearly was not available to testify, the trial court effectively prevented Smith from obtaining any assistance of an expert at the penalty phase. The establishment of mitigating circumstances at the penalty phase is of the greatest importance when a defendant is facing the death penalty. To deny Smith the means to obtain expert testimony was an abuse of discretion.

Finally, the prosecutor's closing argument in the penalty phase of the trial went far beyond the duty of a prosecutor to "prosecute with earnestness and vigor" and degenerated into a speech on the prosecutor's personal moral views. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Essentially, much of his argument at the death penalty phase was to effectively tell the jury that "you owe it to me to return the death penalty." This is a direct violation of the ABA Standards on proper argument.

The ABA Model Rules of Professional Conduct, Rule 3.4(e) states that a lawyer "shall not ... in trial ... state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of the accused...."

The trial was held in a rural county and many of the jurors were acquainted with the prosecutor. The prosecutor's closing argument was tailored to play to a jury composed of personal acquaintances. The defense counsel did not enjoy this particular advantage. Given the impropriety of the closing argument and the resulting recommendation of death, prejudice could be implied. *Niemeyer v. Commonwealth*, Ky., 533 S.W.2d 218 (1976).

The present case is similar in character to *Miracle v. Commonwealth*, Ky., 646 S.W.2d 720 (1983), where we held that the error "committed by the manner" in which the jury panel was selected was compounded by the tie-in to the prosecutor's closing argument, which "removed all doubt."

I would reverse and remand for a new trial.

LAMBERT, J., joins in this dissent.