Edward Brian YOUNG, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 1999–SC–0391–MR.

Supreme Court of Kentucky.

Aug. 24, 2000.

As Modified Sept. 21, 2000.

---

David E. Eucker, Frankfort, for Appellant.

A.B. Chandler, III, Attorney General, John E. Zak, Assistant Attorney General, Criminal Appellate Division, Office of the Attorney General, Frankfort, for Appellee.

## MEMORANDUM OPINION OF THE COURT

A Muhlenberg County Circuit Court jury convicted Young of manufacturing methamphetamine in violation of KRS 218A.1432 and recommended the maximum sentence of twenty (20) years. The trial court entered judgment in accordance with the jury's recommendation, and Young appeals to this Court as a matter of right. After a review of the trial record, we affirm the judgment of the Muhlenberg Circuit Court.

## BACKGROUND

During an August 1998 traffic stop, Muhlenberg police officers found Lloyd Sorrell in possession of materials typically used to manufacture methamphetamine and arrested him. Sorrell subsequently entered into a plea bargain with the Commonwealth Attorney which allowed him to plead guilty to a charge of trafficking in methamphetamine and receive the minimum five (5) year sentence if he provided truthful information regarding the location of two (2) alleged methamphetamine laboratories. On the basis of Sorrell's information, the authorities obtained and executed a search warrant for a trailer residence which Sorrell indicated belonged to the appellant, Young.

At Young's trial, the Commonwealth's evidence consisted largely of testimony connecting items found during the execution of the search warrant to the materials and procedures involved in the manufacture of methamphetamine. Officer Cheyenne Albro, the director of the Pennyrile Drug Task force and a certified methamphetamine laboratory technician, testified that the most popular manufacturing process was the "anhydrous lithium reduction method" because an individual can "cook" methamphetamine with relatively common materials and equipment:

Q: Would you tell us the chemicals and equipment that are ordinarily used in the manufacture of methamphetamine? I know there's variations, but just the general.

A: The most common one that we are encountering in Western Kentucky at this time is—the proper name for it is the anhydrous lithium reduction method. On the streets, it may be called nazi dope or crank manufacturing.

Those chemicals, in answering your earlier question, the chemicals that are used are not illegal to buy individually. It's when they are put together to process methamphetamine, they then become illegal. And the reason for that is the majority of them are common chemicals that we use everyday. That's also the reason it's one of the most common methods that we're seeing now.

Q: Would you describe some of the chemicals and equipment that are ordinarily found in the manufacture of methamphetamine?

A: In that particular method, some of the chemicals that we encounter would be some type of a petroleum solvent, such as Coleman fuel. We may also see ether used. You may see anhydrous ether used. Denatured alcohol. Methanol, which would be the heat or gas line antifreeze, may be used.

They have to use some type of reactive metal, such as potassium metal, sodium metal, magnesium could probably also be used. The one we encounter the most is lithium metal that they're obtaining primarily from camera batteries.

Anhydrous ammonia is a precursor—when I say precursor that's something that ends up being part of the final product and in that method, it's something that has to be obtained and that has to be present.

Some type of pseudoephedrine or ephedrine. Ephedrine itself is a bronchial dilator.

Q: Where is ephedrine, the drug ephedrine, normally—or how is that normally obtained, if you know?

A: What we're seeing primarily is they're obtaining ephedrine through like the mini-thins that are bought at truck stops, things like that, though actifed, sudafed tablets. Through the equate cold medication.

Q: Over the counter type . . .

A: Yes, sir.

Q: . . . drugs. Go ahead.

A: Another reason this method is so popular is because it doesn't take a lot of elaborate, I guess, you would call it glassware. You know, commonly we see things like plastic containers and quart, gallon fruit jars, things like that. Pyrex dishes, you know, versus the reaction vessels and things like that to manufacture other methods.

You see a lot of like coffee filters used. They may be using paper towels as filters. Funnels.

Q: How are they used in that process? The coffee filters. How are they used?

A: The coffee filters are used to strain products, just the same way a coffee filter is used. They may use it in the beginning process to strain the binding material from the pseudoephed-

rine, when they break it down and separate it.

They may use it in the final process to strain the methamphetamine out of the end product.

Officer Albro and other law enforcement officers who helped execute the search warrant testified that they found, inside and around the trailer, materials and equipment indicative of methamphetamine manufacturing: a blender containing pseudoephedrine powder, a burner unit, coffee filters, a complicated ventilation system, three glass quart jars, a bottle of sulfuric acid, several plastic bottles, a bulb syringe, a funnel, cans of starting fluid, numerous empty Sudafed boxes, empty battery boxes, and a small tank containing a substance Officer Albro identified as anhydrous ammonia. A forensic chemist from the Kentucky State Police Crime Lab testified that he found methamphetamine residue on the coffee filters and inside of the glass jars.

Because Young was not present at the residence at the time the officers executed the search warrant, the Commonwealth introduced testimony indicating that Young lived in the trailer at the time of the search. Sorrell testified that he had personally observed Young "cooking" a batch of methamphetamine the day before his arrest. The officers who executed the search warrant testified that, at the time they arrived at the trailer, the front door stood wide open, the lights and television were on, and they believed someone currently used the trailer as a residence because it was furnished with living room furniture, an entertainment center and a mattress, and clothes were scattered about the place. The Commonwealth also introduced Young's signed statement containing language the prosecutor argued constituted an admission that Young lived at the trailer. Other testimony established that the trailer belonged to Young's parents and that, at the time of the search, electrical power was turned on and the account was in Young's name. The next door neighbor testified that, to her knowledge,

Young had lived with his girlfriend in the trailer since the beginning of the year and still lived in the trailer in August 1998. Muhlenberg County Sheriff's Deputy Charles Perry testified that he had observed Young at the residence approximately three (3) months earlier when he was dispatched to resolve a dispute between Young and his brother, and that he served the arrest warrant for this charge upon Young at the address six (6) days after the search. Deputy Perry explained that, although no one answered when he knocked at both the front and back doors, he arrested Young when the appellant and his ex-girlfriend attempted to "tiptoe" out the back door.

Young testified in his own defense and stated that he had left the trailer in early May 1998 after a dispute with his brother and had left town in the middle of June and had lived in Livermore with his girlfriend for approximately a month prior to August 12th. Young further testified that he did not know how to manufacture methamphetamine and had only had limited social contact with Sorrell, but that he had heard from a third party that Sorrell and another man were using the trailer as a laboratory. Young explained that he and his new girlfriend celebrated their one-month anniversary by renting a hotel room in Central City on August 11, 12 and 13, 1998. According to Young, Deputy Perry found him at the trailer with his ex-girlfriend on August 18 only by coincidence because he had stopped by to "check things out" and his ex-girlfriend came to the property at roughly the same time to remove personal items she had left behind after they separated.

At the conclusion of the presentation of evidence, the trial court denied Young's motion for a directed verdict and instructed the jury regarding both the crime of manufacturing methamphetamine and, on the basis of evidence suggesting that Young may have allowed others to manufacture methamphetamine in the trailer, the lesser included offense of criminal fa-

cilitation of manufacturing methamphetamine. The jury convicted Young of the principal offense and he sought review in this Court.

## DIRECTED VERDICT

Young argues that the trial court erred when it denied his motions for directed verdict at both the close of the Commonwealth's case-and-chief and the close of all evidence and his motion for a new trial because "[t]he evidence did not show beyond a reasonable doubt that [Young] possessed the items seized by the police" and "only the testimony of Lloyd Sorrels directly connected [Young] with the items seized from the premises." We note that Young's argument ignores all of the evidence suggesting that he lived in a trailer permeated with materials and equipment used for the manufacture of methamphetamine, and we believe this evidence allowed a jury to reasonably conclude, under either a constructive possession theory,[1] or merely as a reasonable inference from the evidence, that Young possessed the items in his home.

■ This Court reviews allegations of error with respect to trial court denials of motions for directed verdict to determine whether "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, [and] only then the defendant is entitled to a directed verdict of acquittal."[2] The trial court's instruction tracked the language of KRS 218A.1432 and required the jury to find that Young both possessed the materials and intended to use them to produce methamphetamine:

> You will find the defendant guilty of manufacturing methamphetamine under

this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about August 13, 1998, and before the finding of the indictment herein, he possessed chemicals or equipment used in the manufacture of methamphetamine;

AND

B. That he intended to use the chemicals or equipment to manufacture methamphetamine.

■ As Young essentially conceded at trial that the array of chemicals and equipment found at the trailer could only have been used to manufacture methamphetamine, the only factual dispute remaining was whether Young or some other person or persons operated the methamphetamine lab. We find that the trial court properly submitted the case to the jury for it to resolve that factual issue. The extensive evidence connecting Young to the trailer (and the chemicals and equipment) sharply rebuts Young's contentions, and justified the trial court's rulings on Young's motions which protested evidentiary insufficiency.

## EVIDENCE OF YOUNG'S PREVIOUS METHAMPHETAMINE MANUFACTURING

Young argues that he suffered prejudice when the trial court allowed the Commonwealth to introduce testimony from Sorrell indicating that he had observed Young "cooking crank" at the trailer on somewhere between six (6) and eight (8) previous occasions during 1998 and that Young had taught him how to perform the procedure. Young describes this testimony as

1. *See Houston v. Commonwealth*, Ky., 975 S.W.2d 925, 928 (1998) ("[W]e hold that for offenses arising under KRS 218A, the concept of 'constructive possession' is applicable." *Id.*). *See also Rupard v. Commonwealth*, Ky., 475 S.W.2d 473 (1972); *Franklin v. Commonwealth*, Ky., 490 S.W.2d 148 (1972), *cert. denied*, 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973); *Leavell v. Commonwealth*, Ky. 737 S.W.2d 695 (1987); *Clay v. Common-*

*wealth*, Ky.App., 867 S.W.2d 200 (1993); *Dawson v. Commonwealth*, Ky., 756 S.W.2d 935 (1988); *Hargrave v. Commonwealth*, Ky., 724 S.W.2d 202 (1986), *cert. denied*, 484 U.S. 821, 108 S.Ct. 81, 98 L.Ed.2d 43;

2. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991) (citing *Commonwealth v. Sawhill*, Ky., 660 S.W.2d 3 (1983)).

inadmissible KRE 404(a) character evidence.

Prior to trial, the Commonwealth filed notice, pursuant to KRE 404(c), that it intended to introduce KRE 404(b) evidence that Young had operated the methamphetamine lab for several months and had trained others in how to manufacture methamphetamine. Young filed a memorandum objecting to the admission of such evidence, and the Court heard arguments on this issue in chambers prior to trial. The trial court ruled that the Commonwealth could introduce the evidence to prove Young's knowledge of methamphetamine manufacturing.

Sorrell testified during the Commonwealth's direct examination of him that Young taught him to manufacture methamphetamine in January 1998, that he had periodic contact with Young at Young's trailer residence, and that Young principally used a back bedroom in the trailer to manufacture methamphetamine.

We hold that the trial court properly ruled that the evidence regarding Young's methamphetamine manufacturing during the preceding months was admissible to show that Young had knowledge of this process. At trial, Young maintained that he did not know how to manufacture methamphetamine. Under KRE 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible: (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, *knowledge,* identity, or absence of mistake or accident .... [3]

In order to prove Young guilty of methamphetamine manufacturing, the jury instructions required the Commonwealth to demonstrate that Young possessed the chemicals and other equipment "with the intent to manufacture methamphetamine." [4] KRS 218A.1431(1) defines "manufacture" as:

> [T]he production, preparation, propagation, compounding, conversion, or processing of methamphetamine, or possession with intent to manufacture, either directly or indirectly by extraction from substances of natural origin or independently by means of chemical synthesis, or by combination of extraction and chemical synthesis .... [5]

We hold that the trial court properly found Sorrell's testimony relevant to the question of whether Young knew how to manufacture methamphetamine from the materials assembled at the trailer, and we find evidence concerning Young's knowledge highly probative of his intent.[6] The trial court did not abuse its discretion in determining that the risk of prejudice associated with this evidence did not substantially outweigh its relevance.[7]

### EVIDENCE OF ANHYDROUS AMMONIA THEFT

Young also asserts he was prejudiced by testimony that persons who "cook" methamphetamine typically obtain the quantities of anhydrous ammonia necessary for the procedure by stealing it from farm supply stores and by Sorrell's testimony that he and Young had, in fact,

**3.** KRE 404(b) (emphasis added).

**4.** *See* KRS 218A.1432(1)(b).

**5.** KRS 218A.1431(1).

**6.** *See State v. Scarberry,* 2000 WL 504589 (Iowa App.2000) ("The State charged Scarberry and Fry with conspiracy to manufacture methamphetamine and possession of pseudoephedrine. Evidence that Scarberry knew how to manufacture methamphetamine and had done so for his own personal use is relevant to establish his knowledge about manufacturing the illegal substance ." *Id.*). *See also Tamme v. Commonwealth,* Ky., 973 S.W.2d 13 (1998); *Tucker v. Commonwealth,* Ky., 916 S.W.2d 181 (1996); *Jones v. Commonwealth,* Ky., 554 S.W.2d 363 (1977).

**7.** *Partin v. Commonwealth,* Ky., 918 S.W.2d 219, 222 (1996).

stolen anhydrous ammonia in this manner. Young contends the evidence concerning theft of anhydrous ammonia "has nothing to do with any of the facts of consequence, and only inflames a rural jury with evidence of theft from farm supply stores."

During the pre-trial discussion in chambers regarding this evidence, the trial court ruled evidence relating to Young's theft of anhydrous ammonia relevant to the extent that it related to Young's knowledge of the methamphetamine manufacturing process. During the Commonwealth's direct examination of Officer Albro, the prosecutor asked how a person obtains anhydrous ammonia and Officer Albro responded:

> What we are seeing in the Pennyrile area and what we're hearing from confessions of suspects that we deal with is that the majority of all it is stolen or bought from individual [sic] who have stolen it. The primary source that they're getting this from—the farmers and the tanks in the fields, or like the co-op crop, Southern States, places like that, where they steal them out of larger containers.

During the Commonwealth's direct examination of Sorrell, the prosecutor solicited testimony concerning the manner in which Sorrell and Young obtained anhydrous ammonia:

Q: How many times in 1998 did you personally go to his residence in that mobile home on Highway 175 North?

A: Six, maybe eight. Six, eight times.

Q: For what purpose did you go to this residence?

A: To get anhydrous. For him to show me where to get anhydrous.

Q: Why did you need anhydrous?

A: To cook methamphetamine.

Q: Well, did he have anhydrous there at his house?

A: No.

Q: Well, how would you get anhydrous ammonia?

A: We'd go to the farm supply away from his house there on the other side of Bremen. I don't even know—I don't know the name of it and get it there.

Q: You mean you went to a business?

A: Yeah.

Q: Went inside and bought some anhydrous ammonia?

A: No. We'd go at night and steal it out of a tank.

Q: Well, tell us how it would be stolen out of a tank?

A: Hook the hose to a gas jug and turn it on and fill the gas jug up.

Q: And for what use was this? Why did you do this?

A: To cook crank.

Q: How many different occasions did you and [Young] go to these places and obtain anhydrous ammonia?

A: Me and him, I think, twice or maybe three times. It might have been three times, I believe, that we went there.

. . .

Q: Tell us what was done on these occasions that you told us about with the anhydrous ammonia.

A: Well, if he needed it, I'd leave some with him and I'd take it. Whatever, you know, I'd fill me up a tank and take it with me. If he needed some of it, or if he needed—I'd leave him a tank or leave him the jug, and take a tank myself.

Following Sorrell's testimony, the trial court admonished the jury with respect to the permissible uses of this evidence:

> You are further instructed concerning that testimony that the defendant was with this witness and there was some items stolen, you shall not consider the evidence of taking the anhydrous ammonia on other occasions for any purpose, except insofar as it may tend to show, if it does so, a motive and intent, prepara-

tion or knowledge on the part of the defendant to commit the offense for which the defendant is being tried in this case.

We find that the trial court properly found evidence that Young covertly obtained quantities of anhydrous ammonia relevant to the appellant's intent,[8] and we further find that the trial court's admonition prevented Young from suffering prejudice as a result of the introduction of this evidence.[9]

## PENALTY RANGE

During a pre-trial conference in chambers, the trial court instructed the attorneys that he would not allow them to discuss the penalty range of Young's charge during closing arguments:

> Alright. Now, also on the record, Mr. Barber has never done this, but it has been done. If we get to—we should get to the closing arguments early afternoon, neither the Commonwealth or the defendant shall be allowed to argue to the jury the penalty range in the guilt phase.

Young contends the jury recommended the maximum sentence of twenty (20) years in his case as a result of his trial counsel's failure to voir dire the jury panel to determine if they would be able to consider the full range of penalties and by what he refers to as prosecutorial misconduct by the Commonwealth during its sentencing phase closing argument. While Young concedes he did not preserve these errors for appellate review, he asks us to consider them under RCr 10.26.

Although the record indicates that Young's trial counsel did not address the penalty range during voir dire, we fail to see how Young's observation of this fact states any reviewable claim of error. The trial court merely cautioned counsel to avoid mentioning the penalty range during *closing arguments*. While Young asserts that the trial court's "stricture" denied him "the right to gain information which would determine whether his jury would consider the entire range of punishment," we believe the trial court articulated the scope of its ruling, and we can find nothing in the record to support Young's assertion that his counsel believed the trial court had restricted voir dire on this topic. We hold, therefore, that this portion of Young's argument fails to state any claim of error, and we decline further comment.

Young argues that the attorney for the Commonwealth committed prosecutorial misconduct during his closing argument by appealing to the jury to "set a community standard," "to send a message throughout this community [that if] you start manufacturing methamphetamine in Muhlenberg County ... you're gonna receive the maximum punishment that we can give you," and "[t]o send a message to these people to discontinue this type of activity." Young argues this Court has previously condemned this type of argument in *Dam-*

8. We note that the 2000 General Assembly appears to have reached a similar conclusion regarding the factual connection between anhydrous ammonia theft and methamphetamine manufacturing, as, in House Bill 501, it created a new section of KRS Chapter 250 to prohibit, as a Class D felony, possession of anhydrous ammonia in an unapproved container and tampering with facilities storing or transporting anhydrous ammonia. The same legislation amended both KRS 514.030, theft by unlawful taking, and KRS 514.110, receiving stolen property, to make the theft and knowing possession of stolen anhydrous ammonia a Class D felony regardless of value. The penalties for each of these offenses be-

come a Class B felony for a first offense and a Class A felony for a subsequent offense if the Commonwealth additionally proves that the defendant intended to manufacture methamphetamine in violation of KRS 218A.1432. Although this legislation had not been passed at the time of Young's trial, we find it additional persuasive evidence of the relevance of this testimony.

9. *See Alexander v. Commonwealth*, Ky., 862 S.W.2d 856, 859 (1993); *Castle v. Commonwealth*, Ky., 228 Ky. 151, 14 S.W.2d 387, 388 (1929).

*ron v. Commonwealth*[10] and *Payne v. Commonwealth.*[11] As Young made no contemporaneous objection to the prosecutor's statements, he asks us to find that the Commonwealth's alleged misconduct constituted "[a] palpable error which affect[ed]" his "substantial rights" and determine that "manifest injustice has resulted from the error."[12]

■ Although the appellate courts in this state have addressed issues relating to the content of prosecuting attorney's closing arguments on a number of occasions, we note that the vast majority of these cases predated bifurcated sentencing procedures,[13] address properly preserved errors, and analyze prejudice with the defendant's presumption of innocence as unspoken context.[14] Young asks us to reverse his sentence and remand his case to the trial court for a new sentencing hearing because of allegedly improper arguments made exclusively during the sentencing phase of his trial after the jury had already determined Young's guilt, and to which he made no objection at trial. RCr 10.26 review differs from review of preserved errors in that the critical determination for this Court in a "palpable error" case is whether the defendant suffered "manifest injustice." The Sixth Circuit Court of Appeals noted

in *Cook v. Bordenkircher,*[15] that errors may occur for reasons, such as gamesmanship, which we believe to be inconsistent with a "manifest injustice" finding:

> Although failure to object does not bar relief, it, too, is a significant consideration.... We can only wonder whether trial counsel erred or whether they deliberately failed to object to prevent correction of the error and have an issue on which to appeal in an otherwise error-free trial where proof of guilt was compelling.[16]

Accordingly, we feel it appropriate to examine the criteria relevant for palpable error review of alleged instances of prosecutorial misconduct in sentencing phase closing arguments.

■■ An appellate court's review of alleged error to determine whether it resulted in "manifest injustice" necessarily must begin with an examination of both the amount of punishment fixed by the verdict and the weight of evidence supporting that punishment.[17] Other relevant factors, however, include whether the Commonwealth's statements are supported by facts in the record[18] and whether the allegedly improper statements appeared to rebut arguments raised by defense counsel.[19] Finally, we must always consider these clos-

---

**10.** Ky., 687 S.W.2d 138, 143 (1985).

**11.** Ky., 623 S.W.2d 867, 870 (1981).

**12.** RCr 10.26.

**13.** KRS 532.055(2) ("Upon return of a verdict of guilty or guilty but mentally ill against a defendant, the court shall conduct a sentencing hearing before the jury, if such case was tried before a jury. In the hearing the jury will determine the punishment to be imposed within the range provided elsewhere by law. The jury shall recommend whether the sentences shall be served concurrently or consecutively." *Id.*).

**14.** *See, e.g., Damron v. Commonwealth, supra* note 10 at 142; *Wallen v. Commonwealth,* Ky., 657 S.W.2d 232, 234 (1983); *Lynem v. Commonwealth,* Ky., 565 S.W.2d 141, 144 (1978); *Wilson v. Commonwealth,* Ky., 411 S.W.2d 33, 35 (1967).

**15.** 602 F.2d 117, 121 (6th Cir.1979).

**16.** *Id.*

**17.** *See Abernathy v. Commonwealth,* Ky., 439 S.W.2d 949, 953 (1969).

**18.** *See, e.g., Damron v. Commonwealth, supra* note 14 at 142–3; *Wilson v. Commonwealth, supra* note 14 at 35; *Wallen v. Commonwealth, supra* note 14 at 234 ("We have not engaged in any blanket condemnation of prosecutorial comment related to deterrence. We have condemned argument only where the prosecutor suggests that the jury convict or punish on grounds or for reasons not reasonably inferred from the evidence." *Id.*).

**19.** *See Cook v. Bordenkircher, supra* note 15 at 121.

ing arguments "as a whole"[20] and keep in mind the wide latitude we allow parties during closing arguments.[21]

■ After examining the record, we hold that Young did not suffer "manifest injustice" as a result of the prosecution's sentencing phase closing argument. While the jury did recommend the maximum sentence of twenty (20) years, the Commonwealth introduced overwhelming evidence that Young manufactured methamphetamine on a relatively large scale. Although Young characterizes the Commonwealth's statements as improper comment on the consequences of the jury's verdict by focusing on general deterrence of drug activity, we find the prosecutor's statements reasonably supported by the trial record and responsive to defense counsel's contention that the jury should recommend the minimum sentence because, among other reasons, Young had "never been— never sold drugs—never been convicted of selling drugs." The full text of the Commonwealth's sentencing phase closing argument clarified the "send a message to drug dealers" rhetoric and made it clear that the Commonwealth wanted the jury to know that Young's methamphetamine manufacturing placed him in the drug trafficking stream of commerce.

We also note that Kentucky's sentencing procedures do not give juries absolute sentencing authority. KRS 532.070(1) leaves the final determination regarding sentencing up to the trial court:

> When a sentence of imprisonment for a felony is fixed by a jury pursuant to KRS 532.060 and the trial court, having regard to the nature and circumstances of the crime and to the history and character of the defendant, is of the opinion that a sentence of imprisonment is necessary but that the maximum term

fixed by the jury is unduly harsh, the court may modify that sentence and fix a maximum term within the limits provided in KRS 532.060 for the offense for which the defendant presently stands convicted.[22]

Here, Young made a specific request for leniency to the trial court prior to final sentencing, and the trial court denied his request and imposed the jury's recommended sentence. While KRS 532.060 does not insulate all sentencing phase errors from palpable error review, we believe Kentucky's sentencing procedures provide an additional layer of protection from prejudice which we should consider in the context of RCr 10.26 review in this case. Because of all of the above considerations, we do not believe Young is entitled to RCr 10.26 relief.

### SUPPRESSION ISSUE

Young contends that the trial court erred when it denied his motion to suppress the fruits of the search in this case because the affidavit upon which the police officers obtained a search warrant did not disclose the fact that the informant, Sorrells, had entered into a plea bargain with the Commonwealth. Young, however, did not designate as part of the record on appeal the pre-trial hearing conducted by the trial court on his motion to suppress. This Court explained, in *Davis v. Commonwealth*,[23] that it will not address suppression issues without an adequate record:

> Appellant has failed to show that the ruling below was not supported by substantial evidence. "In the absence of any showing to the contrary, we assume the correctness of the ruling by the trial court." It is the duty of a party attacking the sufficiency of evidence to produce a record of the proceeding and

**20.** *Wallen v. Commonwealth, supra* note 14 at 234.

**21.** *Bowling v. Commonwealth,* Ky., 873 S.W.2d 175, 178 (1993). *See also Williams v. Commonwealth,* Ky., 644 S.W.2d 335 (1982).

**22.** KRS 532.070(1).

**23.** Ky., 795 S.W.2d 942 (1990).

identify the trial court's error in its findings of fact. Failure to produce such a record precludes appellate review.

... This Court will not entertain appellant's claim of error when supported only by a motion and an order.[24]

We apply the *Davis* rule in this case and do not reach Young's alleged error.

For the reasons discussed above, we affirm the judgment of the Muhlenberg Circuit Court.

All concur.

**24.** *Id.* at 949 (emphasis added).