# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: DECEMBER 15, 2022
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0401-MR

BRANDON HAMBRICK                                                                    APPELLANT

V.

ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE KATHLEEN LAPE, JUDGE
NO. 19-CR-01632-001

COMMONWEALTH OF KENTUCKY                                               APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

Brandon Hambrick Jr. appeals as a matter of right[1] from the Kenton Circuit Court judgment sentencing him to forty-years' imprisonment for his conviction of murder. On appeal, Hambrick raises three claims of error, none of which merit reversal. Accordingly, we affirm his judgment of conviction and sentence in all respects.

## I.    Factual and Procedural Background.

This case arises from a convoluted grudge held between two groups of young men, either over disrespectful lyrics in rap videos made by each group about the other or because of a marijuana transaction gone awry. In either

---

[1] Ky. Const. § 110(2)(b).

case, the result remains the same: one young man is dead and two are now in prison for their roles in his murder.

One month prior to the murder, Ishmail Powell, the brother of the victim, Ke'Ovion Seay, was in an increasingly acrimonious public feud with Deangleo Jones-Smith. These juveniles were members of rival groups: Powell and Seay a part of CBG,[2] based in Covington, and Jones-Smith and Hambrick members of Money Over Fame ("MOF"), based in Newport. The groups' members had been creating rap videos featuring lyrics that disrespected the other group. Members of the two groups had also transacted with each other for marijuana. Powell allegedly purchased marijuana from a member of MOF using counterfeit money and relations between the two factions deteriorated further as members of MOF made threats of gun violence. An attempt to mediate the conflict by the boys' guardians (by way of having the Powell and Jones-Smith simply engage in a fistfight to avoid further escalation) failed. Matters came to a head on August 3, 2019, at the annual Old Timers Festival in Covington.

Powell and a small group of his friends encountered Jones-Smith, Hambrick, and two other young men, Elijah Maney and Elijah Beamon, while walking through the River's Edge apartment complex on their way back to the festival. Powell saw Jones-Smith and Hambrick holding guns in their hands and, cognizant of the feud between himself and the other group, backed away while calling Seay for assistance. Powell remained distant from what occurred

---

[2] The Court's review of the record uncovered no explanation as to the meaning of CBG.

and though he heard the shots, he did not see what happened.  He further was unaware his brother had been killed until after the altercation was over.

Of the members of CBG, only one approached Jones-Smith.  Jones-Smith had wandered away from Hambrick and the others and was standing near a garbage area when Seay started to walk up to him.  Jones-Smith pointed his gun at Seay, to which Seay responded by walking away and stating that if Jones-Smith would not fight then he would fight Hambrick.  As Seay walked toward Hambrick, Jones-Smith fired his weapon three times into the air to frighten Seay.  Unfortunately, the shots did not have the effect he intended.

Eli Maney was the witness at trial who observed most of the events that night.  Although his testimony wavered on points, Maney told the jury he was positioned between Jones-Smith and Hambrick when he heard multiple rounds of gunshots.  The first round came from the direction of Jones-Smith as Maney saw him go behind garbage receptacles.  The second round came from the direction of Hambrick, not from Jones-Smith.  After the second round of shots, Maney began running in the same direction as Seay.  Maney heard the third round of shots while he was running and felt something, he believed it to be bullets, pass by his head.  Maney continued to run and saw neither the bullets hit Seay nor anyone shooting.

Morgan Barnes had driven the MOF group to the Old Timers Festival in the late afternoon, but did not stay.  After spending several hours at a friend's house, Barnes drove near the River's Edge complex and noticed a large police presence.  This prompted her to call Hambrick, with whom she had an intimate

3

relationship. Hambrick told her he was fine, that he was at his house, and that she could come see him if she wanted. Barnes went to see Hambrick and the two drove to Newport's Purple People Bridge where Hambrick admitted to her, "I shot my cousin. I love you. I'll talk to you soon."[3] Hambrick then exited the car and Barnes had no additional contact with Hambrick from that point.

Seay was shot twice and died from his injuries. Covington Police located three sets of shell casings, two sets near the garbage area and one set roughly ten yards from Seay's body which was approximately one city block from the garbage area. Ballistics identified three casings near the garbage area as having come from Jones-Smith's gun and matched the remaining four casings—two found in a separate grouping close to the garbage area and two near Seay's body—to a single unidentified firearm. In other words, these latter four casings were excluded as being shot from Jones-Smith's gun. Neither bullet that struck Seay remained in his body and police were unable to locate the slugs, which precluded matching the fatal shots to the weapons of either Jones-Smith or Hambrick.[4]

Police were able to identify the group that arrived with Jones-Smith and Hambrick and learned that only Jones-Smith and Hambrick possessed firearms that night. Jones-Smith turned himself in shortly after the incident.

---

[3] Seay was Hambrick's cousin.

[4] Jones-Smith provided his weapon to law enforcement. Hambrick's weapon was never located.

Police arrested Hambrick not long after and charged both Hambrick and Jones-Smith as juveniles with murder. The district court transferred their cases to the Kenton Circuit Court after the district court judge made the requisite findings.

Jones-Smith accepted an offer from the Commonwealth that allowed him to plead guilty to manslaughter in the first degree in exchange for testimony against Hambrick. The jury found Hambrick guilty of murder after a three-day trial and recommended he be sentenced to forty-five years' imprisonment. At sentencing, however, the judge imposed a slightly shorter sentence of forty years. Hambrick now appeals this judgment and sentence.

## II.  Analysis.

Hambrick raises three claims of error on appeal: (1) the Commonwealth made misleading statements during trial and before the judge during arguments on jury instructions; (2) the Commonwealth argued facts not in evidence; and (3) the trial judge erred in admitting an excessive number of autopsy photos. We address each claim in turn.

### A. Misleading Statements.

Hambrick first argues that his trial was rendered fundamentally unfair by the Commonwealth's misleading statements. This argument revolves around statements made by an apparent eyewitness, Le'Nay Webb, to detectives that Jones-Smith in fact fired his weapon at Seay. Hambrick claims that the Commonwealth misrepresented to the judge and jury that no one saw

Jones-Smith shoot at Seay, and therefore its statements amount to prosecutorial misconduct. We disagree.[5]

The crux of Hambrick's argument comes from testimony provided by Detective Robert Fain during the transfer hearing for Jones-Smith and Hambrick. There, Det. Fain discussed speaking to Webb who was present with Seay during the shooting. As described by Fain:

> We had another witness, Le'Nay Webb, who was with the deceased, [Seay], and she had stated that when she was with him, she saw him—he handed her a plate of food, he crossed the street, and then that's when he ran into the trouble. She stated that it was Deangelo Smith-Jones [sic] that opened fire on Mr. Hambrick first.

Det. Fain later corrected himself that Webb stated Jones-Smith fired upon Seay, not Hambrick. Webb herself did not testify at the transfer hearing, nor was she called as a witness during Hambrick's trial.[6]

During trial, while discussing jury instructions with the trial judge, the Commonwealth made statements to the judge regarding the evidence against Hambrick and Jones-Smith:

> *Prosecutor*: We have a dead person here and the evidence is that Brandon Hambrick shot him. That's what we're here for. So, we don't have any direct evidence from Brandon Hambrick himself saying that the state of

---

[5] As to this claim of error, we note initially that Hambrick has failed to provide citations to the record where the Commonwealth is alleged to have misled the jury. This failure violates our appellate rules. Kentucky Rules of Civil Procedure (CR) 76.12(4)(c)(v). Our case law is clear that "an appellate court will not sift through a voluminous record to try to ascertain facts when a party has failed to comply with its obligation under [our rules of procedure] . . . to provide specific references to the record." *Parker v. Commonwealth*, 291 S.W.3d 647, 676 (Ky. 2009)). Nonetheless, our own review of the record convinces us that the Commonwealth committed no misconduct in its statements to the jury.

[6] The record reveals the Commonwealth subpoenaed Webb for trial, but she was apparently never successfully served.

mind was lesser than the intent for murder. What we have is a situation where they're trying to piggy-back on the lesser because the co-defendant got it, therefore I should get it. Well, the co-defendant testified to a specific set of events which did not include him shooting at, or shooting, or killing the victim, Ke'Ovion Seay. We don't have that in this instance. What separates Deangelo Jones-Smith from Brandon Hambrick is his conduct in this instance. And his conduct in this instance and why [Jones-Smith] plead to manslaughter first degree is he went over there to do harm, but he didn't end up killing [Seay]. What we have here [involving Hambrick] is a criminal act where the victim Ke'Ovion Seay was killed. That's what distinguishes it. That's why [Jones-Smith] gets the manslaughter and that's why [Hambrick] should get the murder charge.[7]

. . .

*Prosecutor*: The evidence showed that Deangelo Jones-Smith could not possibly have shot or killed Ke'Ovion Seay based on the location of where the ballistics were found, how far away he was from the body, the fact that there was no blood trail, there's no evidence that Ke'Ovion Seay moved after being shot.

. . .

*Judge*: Okay, so there is no evidence that Deangelo could have shot, might have shot—no evidence put on that it was Deangelo that shot . . .

*Prosecutor*: No.

*Judge*: . . . the victim.

. . .

---

[7] This is the full transcription of one of the few citations to the jury trial provided by Hambrick for this claim. By contrast, Hambrick's transcription was the following: "the evidence that we have in this situation did not include shooting at or killing Ke'Ovion Seay... that is what separates the conduct of Deangelo Jones-Smith." Hambrick's transcription could be described generously as a "liberal summation" or more harshly as a "misrepresentation of the record to this court." We implore appellate counsel to double-check the accuracy of transcriptions in future briefs submitted before this and any other court.

> *Prosecutor:*  . . . [T]here's no evidence that Hambrick was there and shooting but not the one who killed him.  He's either the one who's shooting or he didn't shoot at all.

Hambrick points us to no specific statements by the Commonwealth made in the presence of the jury to the effect that no one saw Jones-Smith shoot at Seay.  The trial recording shows instances of the Commonwealth suggesting to the jury that Jones-Smith shot into the air and that Hambrick alone fired at Seay.  This argument was, of course, the Commonwealth's entire theory of the case.  We find, and Hambrick cites to, no other instances of the Commonwealth suggesting that no other witnesses existed or that no one saw Jones-Smith shoot at Seay rather than in the air.

Hambrick did not object at trial to either the Commonwealth's statements to the judge or its relevant statements before the jury.  Accordingly, when a defendant alleges prosecutorial misconduct but made no contemporaneous objection, "we will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair."  *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010) (citing *Barnes v. Commonwealth*, 91 S.W.3d 564 (Ky. 2002); *Partin v. Commonwealth*, 918 S.W.2d 219 (Ky. 1996)).  We weigh four factors in consideration of such conduct being "flagrant": "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Brafman v. Commonwealth*, 612 S.W.3d 850,

861 (Ky. 2020) (citing *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016)).

The case against Hambrick was largely circumstantial. The Commonwealth presented Jones-Smith who testified that he fired into the air twice to scare off Seay. Maney conceded that the second round of shots came from near where Hambrick was standing, although he never stated definitively that Hambrick fired the shots. Barnes told the jury Hambrick admitted to killing his cousin, but Hambrick argued that was just a reference to his role in the feud that led to Seay's death. Ballistics evidence confirmed that the second and third round of shots came from the same gun, but police never recovered the gun, although these shots did not come from Jones-Smith's gun. The geography of the crime scene made it overwhelmingly likely that bullets from the third round of shots killed Seay, but because police were unable to recover the slugs that killed Seay, they had no way to confirm their theory. Hambrick's guilt rested upon the Commonwealth's ability to convince the jury that Hambrick had a gun, shot at Seay, and that his shots, not Jones-Smith's, caused Seay's death. Certainly, a witness willing to testify that Jones-Smith fired *at* Seay would be damaging to the Commonwealth's case.

At the close of trial, the trial court raised the question of jury instructions. Defense counsel sought a complicity instruction but argued that it should be limited to manslaughter first degree because that was what Hambrick's co-defendant received in his plea deal. The Commonwealth opposed any complicity instruction, arguing the facts and Hambrick's defense

9

made the case an all-or-nothing proposition. The Commonwealth contended that because Hambrick's defense was that he did not shoot at Seay *at all* and that either Jones-Smith or a person unknown was responsible for the gun fire, no manslaughter first degree instruction, either as a pure lesser or complicity instruction, was warranted.

Hambrick points us to three cases he argues support his position with the most relevant being *Brafman*. There, prosecutors charged Brafman with first- and second-degree arson as well as six counts of attempted murder. At trial, Brafman did little to argue she was not responsible for setting the fires. Rather, Brafman argued that due to intoxication she had no memory of the events of that night. Brafman was the only person to testify to her intoxication and she provided no corroborating evidence. During discussion of jury instructions, the trial court declined to allow a voluntary-intoxication instruction. At closing, the Commonwealth emphasized for the jury the absence of any other testimony regarding Brafman's state of intoxication. The jury convicted Brafman on all counts. Brafman's appellate counsel later discovered courtroom footage taken during a lunchtime break in the trial wherein the prosecutor and detective discussed Brafman's intoxication. The detective described Brafman as "out of her fricking mind" and "meth-ed out." *Brafman*, 612 S.W.3d at 860.

On appeal, Brafman argued in part that the Commonwealth was aware Brafman was intoxicated and strategically avoided asking one of its witnesses, a police detective, about the subject. The prosecutor's argument at closing that

10

"not one single witness testified to you that she appeared under the influence, intoxicated, drugged or anything" amplified this omission. *Id.* We agreed with Brafman that the prosecutor's choice to avoid the subject of intoxication with his witness coupled with his statements at closing constituted flagrant misconduct.

In so holding we noted that the prosecutor's statement to the jury was technically true—no one had testified to Brafman's intoxication other than Brafman herself—and that the evidence against Brafman was "quite strong, perhaps overwhelming." *Id.* at 862. However, the prosecutor's direct and emphatic statement to the jury went straight to Brafman's theory of the case and the statement was neither isolated nor accidental, with the prosecutor "tow[ing] technical lines, asserting merely that no one had affirmatively testified to Brafman's intoxication on the stand, and he knew the advantage he was gaining thereby, namely a certain conviction." *Id.* In the end, even with the wide latitude we grant for closing argument, "what was done here went beyond arguing and construing facts to misleading the jury from the truth on a highly material issue. The conduct went beyond mere advocacy and prosecutorial zeal. It was unnecessarily exploitative and dishonest." *Id.* at 863.

*Brafman* and Hambrick's cases share certain similarities, most notably the technical truth found in the assertion that no one *testified* to seeing Jones-Smith shoot at Seay. However, we also find a significant difference in the fact that Webb's statement was known to Hambrick and his counsel since at least the date of his transfer hearing. No subterfuge occurred between the

11

Commonwealth and witness as was the case in *Brafman.* While we recognized in *Brafman* that the Commonwealth had no duty to elicit adverse testimony on intoxication and that defense counsel could have crossed-examined the detective but elected not to, we nonetheless found the purposeful omission meaningful in the full context of that case. The nature of the offending statements in Hambrick's case and the context surrounding them is distinguishable by the degree of awareness defense counsel had of Webb and her statement.

We also find *Brafman* distinguishable on all four factors we use to determine flagrant conduct. The first factor, whether the remarks tended to mislead the jury or to prejudice the accused, is distinguishable by severity. Certainly, the Commonwealth's implication (since it made no direct statement) prejudiced Hambrick, but whether Jones-Smith shot at or away from Seay in the first round of gunshots had little bearing on Hambrick's defense. The Commonwealth never contended Hambrick fired the first round of shots or that the fatal shots were fired in the first round. That Jones-Smith shot at Seay would not then exclude Hambrick from shooting at Seay, nor would it necessarily undermine the Commonwealth's theory that the shooter of the third round was also the killer of Seay.

As to the first factor as it relates to jury instructions, whether the Commonwealth's statements prejudiced Hambrick by denying him an instruction on manslaughter in the second-degree, we hold they did not. Crucially, the proposed lesser included offense, manslaughter in the first

12

degree, is not distinguished from murder by whether the defendant successfully killed the victim. Both crimes require the jury to find the defendant caused the death of a person. The distinguishing element is the *mens rea*: murder requires intent to kill whereas manslaughter in the first degree requires intent to cause serious physical injury. Evidence that Jones-Smith may also have attempted to kill Seay does not implicate Hambrick's mental state and would not by itself justify placing manslaughter in the first degree before the jury. This distinguishes Hambrick's case from *Brafman*. Whereas the prosecutor's misconduct undermined Brafman's entire defense by depriving her of a voluntary-intoxication instruction, here, even had Webb's statement's been introduced, Hambrick would not necessarily have been entitled to an instruction on manslaughter in the first degree. We weigh the first factor in favor of the Commonwealth.

As to the second and third factors, we have difficulty designating the Commonwealth's comments to the jury, or, more properly, the lack thereof, as either extensive or isolated. The Commonwealth simply did not make any comments to the jury. This alone distinguishes Hambrick's case from *Brafman* as to any misconduct before the jury. However, the Commonwealth did make at least one direct statement to the judge when it responded "no" to the judge's question if "[there was] no evidence put on that it was Deangelo that shot the victim." This was technically true, but considering the statement made by Webb it was ultimately misleading. The statement was purposeful, meant to argue against a lesser-included charge instruction, but it was also isolated. We

13

weigh the second factor in favor of the Commonwealth, and the third in favor of Hambrick.

Lastly, we address the strength of the evidence against Hambrick. As noted, the Commonwealth had no evidence to directly link Hambrick to the murder of Seay. What the Commonwealth did have was circumstantial: social media messages showing Hambrick involved in the feud, witnesses who saw some but not all of what happened, ballistics that could not definitively link the fatal shots to anyone. If the evidence of Hambrick's guilt is not as overwhelming as in *Brafman*, the proof is nevertheless compelling. The evidence at trial established only Jones-Smith and Hambrick carried firearms that night. Jones-Smith turned in his gun and ballistics matched it to two bullets found near where Jones-Smith said he hid. The remaining bullets, including ones found near Seay's body, all matched a single unknown firearm. The lack of a blood trail suggested the fatal shots hit Seay where his body lay. The jury made a reasonable inference to conclude that the unknown firearm was Hambrick's gun and that Hambrick was the one who shot and killed Seay. Hambrick's theories that perhaps Jones-Smith had two guns, or that an unknown assailant gunned down Jones-Smith were little more than conjecture.

In *Brafman* we found the severity of the Commonwealth's misconduct outweighed even the substantial evidence of Brafman's guilt. Here, the evidence is weaker, but so too is the magnitude of the Commonwealth's actions. We have identified only one instance where the Commonwealth made

14

improper statements which we weigh in favor of Hambrick, and we do not weigh it heavily in his favor. Accordingly, because we find the evidence against Hambrick to be compelling and we do not find the other factors outweigh this evidence, we hold that the Commonwealth committed no flagrant misconduct and Hambrick's claim must fail.

## B. *Facts not in Evidence.*

Hambrick's next claim of error comes under the general heading of argumentation of facts not in evidence, but he presents us with several loosely related issues. Defense counsel did not object to these issues during the trial. Accordingly, we review these claims under RCr[8] 10.26 for palpable error. *See, e.g.*, *McCleery v. Commonwealth*, 410 S.W.3d 597, 605 (Ky. 2013) ("A palpable error is clear and plain, affects the substantial rights of a party, and is more likely than other ordinary errors to affect the outcome of the case.").

Hambrick alleges the Commonwealth erred in (a) arguing his lack of remorse during its penalty phase closing; (b) arguing he attempted to convince Jones-Smith to not testify; (c) arguing with Jones-Smith about the content of the jail calls; (d) referring to a prior conversation with Maney; and (e) summarizing the testimony of Maney while Maney was on the stand. We find commonalities sufficient to group issues (a) and (b) as a claim of arguing facts not in evidence at closing and issues (c), (d), and (e) as a claim of improper questioning. We address each argument in turn.

---

[8] Kentucky Rules of Criminal Procedure.

*1. Commonwealth's Closing Argument.*

"We reverse for prosecutorial misconduct in a closing argument only if the misconduct is 'flagrant' or if each of the following are satisfied: (1) proof of defendant's guilt is not overwhelming; (2) defense counsel objected; and (3) the trial court failed to cure the error with sufficient admonishment." *Barnes v. Commonwealth*, 91 S.W.3d 564, 568 (Ky. 2002). Because neither party disputes that element (2) is not satisfied, Hambrick may only prevail if the Commonwealth's misconduct was flagrant according to the test set forth in *Brafman*: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." 612 S.W.3d at 861. We consider closing arguments in their entirety, keeping in mind the wide latitude both parties are allowed during closing statements. *Young v. Commonwealth*, 25 S.W.3d 66, 74–75 (Ky. 2000).

Hambrick argues two instances of improper argumentation, one during the Commonwealth's guilt-phase closing and one during its penalty-phase closing. During its guilt-phase closing, the Commonwealth made several statements regarding jail calls Hambrick had with Jones-Smith prior to trial. During its penalty-phase closing the Commonwealth made statements to the jury regarding Hambrick's alleged lack of remorse and suggesting Hambrick was too dangerous to be the beneficiary of a lenient sentence.

16

As to the first factor, in neither instance can we consider the Commonwealth's remarks to be misleading. The remarks are prejudicial, to be sure; virtually any remark the Commonwealth makes in relation to a defendant will damage his interests in one way or another. But this routine sort of prejudice is insubstantial absent misrepresentation. The Commonwealth's characterization of the jail calls, which it played for the jury and which the Commonwealth discussed with Jones-Smith, and their conclusions regarding those calls were reasonable inferences to be made from the evidence. Although no expert on remorse or criminal rehabilitation testified during the penalty phase, we have nonetheless found comments on a defendant's remorse and propensity to re-offend to be within the wide bounds of permissible argumentation during closing. *See Miller v. Commonwealth*, 283 S.W.3d 690, 704 (Ky. 2009) ("holding that prosecutor's comments that defendant "is out of jail two years and he is raping children" was not misconduct "[g]iven the wide latitude afforded the parties during closing argument."). We weigh this factor in favor of the Commonwealth.

As to the second factor (whether the statements were isolated or extensive) and third factor (whether the statements were deliberately or accidentally placed before the jury), in each instance, the statements were deliberate and formed a portion of the whole argument, more than an isolated remark. The penalty-phase remarks pervaded the Commonwealth's arguments for harsh sentencing, but the guilt-phase remarks were only a relatively minor element of the full closing. We weigh these factors against the Commonwealth.

17

Finally, we have already discussed the final factor, the weight of the evidence against the accused, previously. We reiterate only that the evidence against Hambrick was compelling if not overwhelming, but we nonetheless weigh this factor in favor of the Commonwealth. Considering all four factors, we hold that the statements made by the Commonwealth were not flagrant misconduct, and Hambrick's claim as to those statements is without merit.

*2. Commonwealth's Questioning of the Witnesses.*

Hambrick points us to three instances where he believes the Commonwealth stepped outside the permissible bounds of questioning: (1) during its examination of Jones-Smith, the Commonwealth argued with him about the content of the jail calls between Jones-Smith and Hambrick; (2) during examination of Maney, the Commonwealth repeatedly clarified and restated what Maney had said; and (3) during the questioning of Maney, the Commonwealth made reference to a conversation between the prosecutor and Maney. While the Commonwealth's reference to its out of court conversation with Maney was improper, we nonetheless do not find the questioning to be reversible error.

At trial, during Hambrick's cross-examination of Jones-Smith, Hambrick's trial counsel began a line of questioning with Jones-Smith regarding jail calls he had with Hambrick. Trial counsel's purpose was to suggest Hambrick wanted Jones-Smith to testify to show Hambrick was not involved in the shooting of Seay. On re-direct, the Commonwealth addressed the jail calls. When Jones-Smith denied Hambrick attempted to dissuade him

18

from testifying, the Commonwealth recited to Jones-Smith portions of the jail call and asked Jones-Smith what he meant. Jones-Smith continued to deny Hambrick did not want him to testify.

We struggle to see what Hambrick believes was error in this interaction. Hambrick's trial counsel raised the jail calls during cross-examination. When Jones-Smith denied on redirect that Hambrick did not want Jones-Smith to testify, the Commonwealth impeached Jones-Smith with the contents of the jail calls. Prosecutors ultimately played those jail calls for the jury and entered them into evidence. That the Commonwealth argued with their own witness over the meaning of what was said in those calls seems to us to be a normal part of examining a witness who is present as part of a plea offer and hesitant to testify against a friend. The Commonwealth did not make assertions of fact that run afoul of our decision in *Dillon v. Commonwealth*, 475 S.W.3d 1 (Ky. 2015); rather, the prosecutor asked Jones-Smith if the calls demonstrated Hambrick attempting to dissuade Jones-Smith from testifying. When Jones-Smith answered in the negative, the Commonwealth impeached him with the content of those calls which it subsequently entered into evidence. We perceive this action to be standard trial strategy.

As to the Commonwealth's examination of Maney. Maney was not a perfect witness for the Commonwealth; he was hard to understand, had difficulty staying on topic, and was difficult for the Commonwealth to control. Maney was also the only witness called at trial who saw most of what occurred that night and perceived that Hambrick fired the second and third round of

19

shots (though he refused to say that Hambrick was the shooter).  His testimony

was thus important for the Commonwealth's case.  The prosecutor did what

she could in her examination which included having Maney point to spots on a

map shown on a television screen to indicate where the individuals involved in

the shooting were standing.

At various points in Maney's testimony, the Commonwealth attempted to

clarify or summarize Maney's statements by rephrasing what Maney had said

and asking Maney to confirm if that clarification was correct.  If Maney thought

the clarification was wrong, he did not hesitate to point out the error.  One

such interaction occurred after Maney returned to the witness stand from

pointing out locations on the television-displayed map:

> *Prosecutor*: I wanna recap pointing at the map so that the members of the jury can see what you were drawing.
>
> *Maney*: Okay.
>
> *Prosecutor*: [While pointing at map] You said [Seay] came from over here, [Hambrick's] right here, you're right here, [Jones-Smith] was over here, walked down behind the trash.
>
> *Maney*: Yeah.
>
> *Prosecutor*: [Seay] followed [Jones-Smith] to behind the trash.
>
> *Maney*: Yeah.
>
> *Prosecutor*: The two of them were over there.
>
> *Maney*: Yeah.
>
> *Prosecutor*: And you heard one, maybe two shots go off.
>
> *Maney*: Yeah.
>
> *Prosecutor*: [Seay] was not hit at that time.
>
> *Maney*: Naw, 'cause he walked- naw, he ain't- naw, 'cause-
>
> *Prosecutor*: 'Cause [Seay] walked off.
>
> *Maney*: Yeah, 'cause he walked back like over-

| *Prosecutor:* | [Seay] started walking towards [Hambrick], is that correct? |
|---|---|
| *Maney:* | Yeah, but I dunno who was- I dunno where [Hambrick] was so he could've been, like, you feel what I'm s- like, 'cause, he could've been walking over there but not been going to [Hambrick], but [Hambrick] was over there. |
| *Prosecutor:* | [Hambrick] was over here and I believe you said [Hambrick] was over here alone. |
| *Maney:* | Yeah, naw- Can I get back up? Or shit, how you feeling? Like, shit, what I'm saying is, like, look: I ain't saying, that's why I said there was other people there, 'cause, so, because he, like, I don't know who was all back there; I ain't saying he was just alone, but as far as right there where you pointing at—yeah—he was probably in that little like- |
| *Prosecutor:* | Right here in this vicinity- |
| *Maney:* | Yeah. |

The prosecutor summarized Maney's testimony in this way several times while Maney was on the stand.

We cannot say the Commonwealth's method of questioning in these instances—summarizing or clarifying for the witness what he had just said—is a best practice for those conducting direct examinations, even with a difficult witness. However, in terms of impropriety, at most, the Commonwealth asked its witness leading questions in violation of KRE[9] 611(c). Even so, "the language of that rule makes it clear that the proscription against leading questions is not absolute." *See Tamme v. Commonwealth*, 973 S.W.2d 13, 27 (Ky. 1998); KRE 611(c) (holding that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the

---

[9] Kentucky Rules of Evidence.

21

witness' testimony[]").  Further, even if Hambrick had properly objected to the leading questions, "judgments will not be reversed because of leading questions unless the trial judge abused his discretion and a shocking miscarriage of justice resulted." *Tamme*, 973 S.W.2d at 27.  Ultimately, in this case, the Commonwealth did not state anything that Maney himself did not put before the jury during his testimony.  Further, Maney agreed with the substance of the Commonwealth's summaries and offered his own clarifications as needed.  Accordingly, Commonwealth's questioning did not result in manifest injustice.

Of greater concern during the examination of Maney is the following interaction:

*Prosecutor*:  At this point did you know that [Hambrick] had a gun?

*Maney*:  No, I did not know he had a gun.  I didn't know he had a gun at all.

*Prosecutor*:  Did you suspect he had a gun by his demeanor?

*Maney*:  Naw, when I seen- well, when I seen [Powell] then I seen him go over there I started feeling funny, 'cause like, if it- if I'm arguing with somebody, you know what I'm saying, walk up to them, but everything, everybody different and everybody gonna go about things different, you know what I'm saying?  Like, he could- they both could've been feeling like, like nervous, you know, like anxiety or whatever, you feel me?  So, naw, nope.

*Prosecutor*:  **Do you remember meeting with us probably a few weeks ago?**

*Maney*:  Yeah, yeah.

*Prosecutor*:  **Do you remember talking to us about a hand- you seeing [Hambrick's] hand in his pocket?**

*Maney*:  Yeah, when he was pulling up his pants, yeah when he was pulling up his pants.  It was, it was like, it looked like he could've had something on his waist.  At the same time, I never seen no gun on his waist.  I didn't

22

> see none of that; I was on the other side of him, like, so like-

The Commonwealth's two questions referring to a meeting between the prosecutor and Maney some weeks before the trial run afoul of our holding in *Holt v. Commonwealth*, 219 S.W.3d 731 (Ky. 2007). In *Holt* we held, "assertions of fact from counsel as to the content of prior conversations with witnesses have the effect of making a witness of the lawyer and allowing his or her credibility to be substituted for that of the witness. Such a practice also violates KRE 603 and KRE 802." *Id.* at 737. While such an error is an appropriate basis for reversal under harmless error review, *id.* at 738, here we must determine if the questions merit reversal under our more stringent palpable error standard. *See Dillon*, 475 S.W.3d at 19 (stating, as a result of a failure to object to an impeachment method, "Dillon therefore is not entitled to the benefit of harmless-error review, which requires only a showing that the error had a substantial effect on the verdict. Instead, the alleged error can only be reviewed if it rises to the level of palpable error[]"). We find they do not.

While improper, the questions were of a different character from past cases where we have found reversal appropriate. In *Holt, Dillon*, and *Fisher v. Commonwealth*, 620 S.W.3d 1 (Ky. 2021), the prosecutor asked the questions repeatedly and recited the statements made by the witness during the prior meeting. Further, the content of the prosecutor's improper statement in *Holt* was such that she "practically supplied a purported confession of a criminal defendant to the jury directly and unqualifiedly[.]" *Fisher*, 620 S.W.3d at 15.

23

The prosecutor's statements in *Holt* also directly contradicted the testimony of the witness. *Holt*, 219 S.W.3d at 734.

Here, the Commonwealth did not repeat the offending questions and the content of those questions was not of the same character as seen in *Holt* or *Dillon*. The first question was simply a reference to the prior meeting, not to any statements made during that meeting. The second question approached repeating a prior statement by Maney, suggesting that Maney said he thought Hambrick had a gun when he saw him with his hand in his pocket, but the reference to what Maney actually said was oblique and open ended. When Maney addressed that prior statement he clarified what he previously said, and the prosecutor made no subsequent references to the prior meeting. Even in cases where we have found the Commonwealth's error to be obvious, we have declined to find palpable error based on the improper questioning alone. *Dillon*, 475 S.W.3d at 21 (noting "[t]hat the error is obvious, however, is not the end of the palpable-error inquiry[]"). Here, the Commonwealth limited their questioning, and the witness was allowed to discuss his prior statement without continued impeachment. Accordingly, no manifest injustice resulted from the Commonwealth's questioning.

### C. *The Autopsy Photos were Properly Admitted.*

Finally, Hambrick argues that the trial court admitted an unnecessary number of autopsy photographs of Seay over Hambrick's objection. The trial judge admitted ten autopsy photos, of which Hambrick's counsel objected to

24

seven.[10]  Hambrick argues that the introduction of so many autopsy photos was duplicative and such admission only served to inflame the passions of the jury.

Our rules of evidence permit relevant evidence to be excluded if "its probative value is substantially outweighed by the danger of undue prejudice. . . ." KRE 403.  If a photograph is otherwise admissible, the gruesomeness of the photograph does not by itself make the photograph inadmissible unless "its depictions go 'far beyond demonstrating proof of a contested, relevant fact.'" *Ratliff v. Commonwealth*, 194 S.W.3d 258, 271 (Ky. 2006) (citing *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky. 1992); then quoting *Holland v. Commonwealth*, 703 S.W.2d 876, 879 (Ky. 1985)).

Here, we find the objected-to photographs of Seay to be not unusual for autopsy photographs in that the injuries they depict are sadly common in murder cases.  The photographs are various views of the gunshot wounds Seay received that the Commonwealth used to explain its theory of what happened during the shooting.  The photographs are simply not of the same character as instances where we have found the images to be so gruesome as to go far beyond demonstrating a contested relevant fact.  *See Ratliff*, 194 S.W.2d at 271 (collecting cases).  Additionally, the Commonwealth introduced each

---

[10] At the introduction on the fourth photo, trial counsel objected to all autopsy photographs and sought to stipulate to the fact that Seay had been shot and those shots caused his death.  Trial counsel did not renew his objection for every subsequent photograph that the Commonwealth introduced.  Because our decision does not turn on whether Hambrick properly preserved an objection as to each photograph, we need not delve into the issue further.

photograph to explain a different point of its case.  As such, none of the photographs were duplicative or needlessly cumulative.

Hambrick also argues that he did not contest the manner of Seay's death, thereby making the photographs irrelevant for the jury.  However, "the prosecution is permitted to prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see." *Barnett v. Commonwealth*, 979 S.W.2d 98, 103 (Ky. 1998).  Further, although Hambrick argues the photographs did not go to a contested fact, the nature of the case itself—a chaotic scene without witnesses to the shooting—suggests a clear understanding of Seay's injuries was relevant for the jury.  Accordingly, the trial court did not abuse its discretion in determining the photographs were relevant.

### III.    Conclusion.

For the foregoing reasons, the Kenton Circuit Court is affirmed in all respects.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Linda J. Adkins
Kathleen Kallaher Schmidt
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Thomas Allen Van De Rostyne
Assistant Attorney General